No. 13367

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

---

MONTANA DEPARTMENT OF NATURAL
RESOURCES AND CONSERVATION,

Plaintiff and Appellant,

-vs-

INTAKE WATER COMPANY, a
Delaware Corporation,

Defendant and Respondent.

---

Appeal from: District Court of the Seventh Judicial District,
Honorable Thomas Dignan, Judge presiding.

Counsel of Record:

For Appellant:

Boone, Karlberg and Haddon, Missoula, Montana
Sam E. Haddon argued and William T. Boone appeared,
Missoula, Montana
Ted Doney appeared, Helena, Montana
Robert T. Cummins appeared, Helena, Montana

For Respondent:

Loble, Picotte and Pauly, Helena, Montana
Henry Loble argued and Peter M. Pauly argued,
Helena, Montana
Boyd L. Henderson appeared, Houston, Texas

---

Submitted: October 28, 1976

Decided: DEC 2 ...

Filed:

*Thomas J. Kearney*
Clerk

Mr. Justice Frank I. Haswell delivered the Opinion of the Court.

The Montana Department of Natural Resources and Conservation filed an action seeking a declaratory judgment that Intake Water Company does not have a valid appropriation of 80,650 acre feet per year of the waters of the Yellowstone River and enjoining Intake from use of the water. Intake counterclaimed for a declaratory judgment that it has complied with Montana water appropriation statutes to date and upon continued diligent prosecution of the excavation and construction of the diversion works to completion, it is entitled to relate the priority of its appropriation back to June 8, 1973. The district court, Dawson County, the Hon. Thomas Dignan, district judge presiding without a jury, entered judgment in favor of Intake. The Department of Natural Resources and Conservation appeals.

Plaintiff and appellant is the Montana Department of Natural Resources and Conservation (DNR), an administrative agency of the State of Montana created pursuant to Chapter 15, Title 82A, R.C.M. 1947, whose duties include the administration of water use laws. Defendant, counterclaimant and respondent is Intake Water Company (Intake), a Delaware corporation and wholly owned subsidiary of Tenneco, Inc. Intake is authorized to do business in Montana and its corporate powers include the right to appropriate waters, acquire water rights, and sell the water to customers and users in the manner of a private water company, including the construction of dams, reservoirs and water transmission facilities.

The subject matter of this litigation is a project by Intake involving the appropriation of 80,650 acre feet per year of the waters of the Yellowstone River near the community of Intake in Dawson County, Montana. A diversion facility is to be constructed on land owned by the United States whereby water

will be pumped out of the river, conveyed by pipelines to an off-stream storage reservoir, and from there distributed by pipelines to the service area. Intake intends to sell the water to its customers for irrigation, industrial, municipal and domestic use.

The service area or area of intended use of the appropriated waters are portions of Dawson and Wibaux Counties in Montana and a portion of Golden Valley County, North Dakota. The service area lies generally in a southeasterly direction from the point of diversion some 30 miles. This area contains large coal reserves which form a large part of the water demand for the project. The size of the service area was primarily determined by the extent of usable coal reserves.

DNR claims that the intended use of the appropriated waters is primarily for a coal gasification plant for the production of synthetic gas to supplement declining natural gas reserves. Jack Tindall, general manager of Intake and an official of Tennessee Gas Transmission Company, a Tenneco subsidiary, which is a major natural gas pipeline system that supplies gas to its customers, testified that he became involved in the Intake project because Tenneco and its subsidiaries were looking for alternate supplies of natural gas and water is needed to convert coal to gas. While denying that Tenneco or its subsidiaries had any specific plans to construct a coal gasification plant at the time of trial, he admitted they were working on it and that Tenneco and its subsidiaries could be one of the industrial customers for water from the Intake project. Tindall testified that he made the determination of the amount of Intake's appropriation-- 80,650 acre feet per year--by the amount needed to utilize the coal in the area of intended use (64,000-65,000 acre feet annually) plus other uses and losses that would bring the total to

80,650 acre feet per year.

The off-stream reservoir involved in the project will be approximately 25,000 acre feet in capacity and will inundate approximately 700 acres of land. The purpose of this reservoir is to permit diversion of the river waters during periods of surplus waters and storage of such waters for use during the periods of low water in the river. This system, it is claimed, will minimize the impact of the diversion on the river itself and insure the availability of water for prior appropriators and users downstream.

There is an existing dam that creates a backwater in the river at the diversion site which permits the taking of water without the cost and environmental consequences of constructing another diversion dam across the river.

The project contemplates removal of waters from the Yellowstone River basin and sale of some of these waters outside the basin in North Dakota. Such removal requires unanimous consent of Montana, North Dakota and Wyoming under Article X of the Yellowstone River Compact and requires consent of the Montana legislature under section 89-846, R.C.M. 1947. Neither consent has been secured to date. Intake commenced an action in federal court in June, 1973 to have section 89-846 and Article X of the Yellowstone River Compact declared unconstitutional. (Civil Docket No. 1184, United States District Court for the District Court of Montana, Billings Division). This suit has not been concluded to date.

According to the testimony of Jack Tindall, general manager of Intake, the project would still be economically feasible if industrial users were excluded and only agricultural, municipal and recreational users remained provided these latter users could pay the price to provide a fair return on the capital

expended for the project. There is no substantial evidence indicating whether the project would remain economically feasible if users outside the Yellowstone River basin were excluded.

On June 29, 1973 Intake commenced a suit in state court seeking determination of whether it must comply with the provisions of the Montana Major Facility Siting Act (Ch. 8, Title 70, R.C.M. 1947, as amended) in constructing its diversion works for appropriation of the waters of the Yellowstone River. (Civil Docket 36907, district court, first judicial district, State of Montana, Lewis and Clark County.) This suit remains unresolved to date.

During the period since inception of the project in November, 1972 through September, 1975, Intake has expended $331,700.39 on site-related activities, engineering, market studies, environmental activities, legal fees and administrative expenses directly attributable to construction of the project.

On June 8, 1973 Intake posted its notice of appropriation of the waters at the point of intended diversion and filed notices of appropriation thereafter with the county clerk in each Montana county through which the Yellowstone River flows as required by section 89-810, R.C.M. 1947.

Thereafter Intake took the following identifiable action in the 40 day period following June 8 pursuant to section 89-811, R.C.M., requiring the appropriators to " * * * proceed to prosecute the excavation or construction of the work by which the water appropriated is to be diverted * * *":

(1) In addition to filing copies of the notice of appropriation with the various county clerks and recorders, Intake filed copies of the notice with the director of DNR and the North Dakota State Water Commission.

(2) Intake selected, staked and flagged locations for five test hole borings at the site of the proposed diversion

- 5 -

works to test subsurface soil conditions.

(3) Intake hired a Billings testing laboratory to make the test hole borings and went to the site twice with them to accomplish the same.

(4) Secured a license from the Bureau of Reclamation to construct, operate and maintain a pumping plant at the proposed diversion site.

(5) Filed and proceeded to prosecute the state court suit to determine whether Intake must comply with the Montana Major Facility Siting Act with respect to construction of its diversion works.

(6) Filed and proceeded to prosecute the federal court suit to determine the constitutionality of section 89-846 and Art. X of the Yellowstone River Compact.

(7) Contacted environmental consultants and governmental agencies with respect to required environmental work on the project.

(8) Continued the ongoing drafting of preliminary engineering plans for construction of the diversion works.

(9) Continued the ongoing selection, pricing and availability of equipment for the diversion works.

(10) Continued the ongoing legal and administrative work necessary to construction of the diversion works and completion of the appropriation.

(11) Commenced and continued preparation of the design drawings of the diversion works.

Following this 40 day period up to the time of trial, Intake sponsored a paddlefish study proposed by the Montana Fish and Game Department at a cost to Intake of $5,000; defended the instant suit; hired an environmental consulting firm in Billings to conduct an environmental literature search at a cost to Intake of $4,000; hired an engineering firm in Billings to conduct a

preliminary engineering survey of the proposed diversion including hydrology studies, a recommended operating plan, and identification of three potential locations for an off-stream reservoir; hired a Houston, Texas firm to perform topographic mapping including topographic contours of 61,660 acres of land in the vicinity of Intake to enable Intake to select reservoir sites, pipelines, and aqueduct routes at a cost to Intake of $8,011.77; hired a Denver, Colorado firm to conduct a water marketing study of the demand of water for industrial use in the area of contemplated use; sponsored a study of the aquatic invertebrate life in the Yellowstone River at the request of the Montana Fish and Game Department at a cost to Intake of $50,000; hired a Billings firm to conduct a water demand study for agricultural, municipal and rural domestic use in the contemplated area of use, and secured cross-section data of the profile of the river channel at the point of diversion, took water meter readings, and established a velocity distribution curve.

Future contemplated activities leading to eventual completion of construction of the project and the impoundment of water in the reservoir in January, 1982 include survey and geological investigation of the three potential reservoir sites; socio economic data gathering; review of mitigating measures; climatic and water quality studies; environmental air quality studies;/migratory waterfowl, vegetation and wildlife studies; preparation of an environmental impact report for use by the Bureau of Reclamation, U. S. Department of the Interior, in preparing their environmental impact statement as required by National Environmental Policy Act and the terms of Intake's license; selection of a reservoir site; final engineering design of the diversion work; updating hydrological studies, water market and water demand studies; historical and archaelogical

- 7 -

studies; procurement of a construction permit from the U. S. Army Corps of Engineers; formulation of operating and maintenance plans for the reservoir and diversion works; various activities in connection with the environmental impact statement, public hearings and adoption; land acquisition for the reservoir site; resurveys as necessary; negotiation of water sale contracts; actual construction of the diversion works and reservoir by the contractor; completion of the two pending lawsuits in federal and state court; additional legal and administrative work involved in the completion of construction of the project.

Cost estimates on the project vary depending on the location of the off-stream reservoir, the pipeline distance from the diversion site and the diversion site. Three cost estimates were made depending on which of three reservoir sites was ultimately selected. These estimates varied from a low of $12,753,000 to a high of $22,326,000, depending on location of the reservoir site.

The projected schedule at the time of trial for these future activities contemplated a final environmental impact statement by the Bureau of Reclamation in the spring of 1979; the commencement of construction by the contractor in mid-summer of 1979 and completion of construction about 2-1/2 years later; and impoundment of water in the off-stream reservoir in January, 1982.

The instant suit was filed by DNR against Intake on September 7, 1973. Following completion of pleadings and pre-trial discovery, the case was tried in November, 1975. On January 8, 1976 the district court made and filed extensive and detailed findings of fact and conclusions of law. A judgment and decree based on these findings and conclusions was entered on the same date. The judgment provided in summary that:

(1) Intake fully complied with legal requirements in posting and filing its Notice of Water Right Appropriation on June 8, 1973.

(2) Intake proceeded to prosecute the excavation or construction of the diversion works within 40 days after June 8, 1973 pursuant to section 89-811, R.C.M. 1947.

(3) All of Intake's activities up to the time of trial constitute prosecution or construction of the work by which the water is to be diverted with reasonable diligence and which, if prosecuted with reasonable diligence to completion, entitles Intake to relate back the priority of its appropriation to June 8, 1973.

(4) In the event it is ultimately determined in the state court suit that Intake must comply with the provisions of the Montana Major Facility Siting Act of 1973, any conforming actions taken by Intake constitutes prosecution or construction of the work by which the water appropriated is diverted which if prosecuted with due diligence to completion, entitles Intake to relate back the priority of its appropriation to June 8, 1973.

(5) Intake's appropriation of June 8, 1973 is complete as of that date to the full amount of water its facilities are capable of diverting up to 80,650 acre feet per year for sale and distribution to users for agricultural, industrial, municipal and domestic purposes when its off-stream reservoir and diversion works are completed and Intake is ready and willing to deliver water to users and offers to do so.

DNR has appealed from this judgment and sets forth three issues for review on appeal:

(1) Is Intake the owner of a valid appropriation of 80,650 acre feet per year of the waters of the Yellowstone River as of June 8, 1973?

(2) Did Intake comply with section 89-811, requiring that it proceed to prosecute the excavation or construction of the work by which the water appropriated was to be diverted within 40 days of posting of its notice of appropriation?

(3) Do considerations of equity and public policy preclude Intake from claiming an inchoate right to appropriate 80,650 acre feet per year of the waters of the Yellowstone River?

The contentions of the respective parties illuminate the underlying determinations we must make in this appeal. DNR basically claims that Intake is not the owner of an existing appropriation right at all because such right cannot come into being until all statutory requirements are met and construction is completed; that Intake has lost whatever inchoate rights it may have acquired by posting and filing its notice of appropriation on June 8, 1973 by its failure to " * * * proceed to prosecute the excavation or construction of the work by which the water appropriated is to be diverted * * *" within 40 days after posting its notice of appropriation; that because of a number of legal and practical hurdles that must be overcome in order to construct the project which are totally beyond Intake's ability to control, and because construction will take years to complete, considerations of equity and public policy preclude entry of an open ended decree wherein the fate of over 80,000 acre feet per year of the water of the Yellowstone River will remain unknown and in a state of limbo for many years.

Intake, on the other hand, contends that it is the owner of an existing right by virtue of the posting and filing of its notice of appropriation on June 8, 1973 and its various activities both before and after that date; that it did in fact " * * * proceed to prosecute the excavation or construction of the work by which the water appropriated is to be diverted * * *" within 40

- 10 -

days after posting its notice of appropriation; that it has at all times " * * * prosecute[d] the same with reasonable diligence * * *" toward completion; and that despite the number of legal and practical hurdles it must overcome to actually complete construction of the project, it is entitled to try to surmount these and as long as it proceeds with reasonable diligence to that end, its right to "relation back" of its priority of appropriation to June 8, 1973 is not lost.

We note that as a practical matter Intake posted and filed its notice of appropriation some 22 days before Montana's new Water Use Act of 1973 became effective; and unless the statutory requirements then existing have been and are met by Intake, it is not entitled to relate the priority of its appropriation back to June 8, 1973 and becomes subject to the provisions of the Water Use Act of 1973. We do not suggest that Intake is subject to criticism in doing this or that Intake was motivated by this consideration. In fact the evidence shows that the inception of the project occurred in November, 1972 before the 1973 legislature even met. We simply note the existence of this situation to place the present controversy in perspective.

We further observe that the issues on appeal fundamentally involve the existence and nature of the right acquired by Intake by virtue of its activities to the date of trial.

An overview of the Montana law on appropriation of water and the establishment of water rights and their priority is desirable at the outset.

The statutory law in this area is essentially contained in three statutes:

> "89-810. <u>Notice of appropriation.</u> Any person here-
> after desiring to appropriate the waters of a
> river, or stream, ravine, coulee, spring, lake,
> or other natural source of supply concerning which
> there has not been an adjudication of the right to
> use the waters, or some part thereof, must post

a notice in writing in a conspicuous place at
the point of intended diversion, stating therein:

"1. The quantity of water claimed, measured as
hereinafter provided;

"2. The purpose for which it is claimed and
place of intended use;

"3. The means of diversion, with size of flume,
ditch, pipe, or aqueduct, by which he intends to
divert it;

"4. The date of appropriation;

"5. The name of the appropriator.

"Within twenty days after the date of appropria-
tion the appropriator shall file with the county
clerk of the county in which such appropriation
is made a notice of appropriation, which, in
addition to the facts required to be stated in
the posted notice, as hereinbefore prescribed,
shall contain the name of the stream from which
the diversion is made, if such stream have a name,
and if it have not, such a description of the
stream as will identify it, and an accurate des-
cription of the point of diversion of such stream,
with reference to some natural object or permanent
monument. The notice shall be verified by the
affidavit of the appropriator or some one in his
behalf, which affidavit must state that the matters
and facts contained in the notice are true.

"89-811. <u>Diligence in appropriating</u>. Within forty
days after posting such notice, the appropriator
must proceed to prosecute the excavation or construc-
tion of the work by which the water appropriated is
to be diverted, and must prosecute the same with
reasonable diligence to completion. If the ditch
or flume, when constructed, is inadequate to convey
the amount of water claimed in the notice aforesaid,
the excess claimed above the capacity of the ditch
or flume shall be subject to appropriation by any
other person, in accordance with the provisions of
this chapter.

"89-812. <u>Effect of failure</u>. A failure to comply
with the provisions of this chapter deprives the
appropriator of the right to the use of water as
against a subsequent claimant who complies therewith,
but by complying with the provisions of this chapter
the right to the use of the water shall relate back
to the date of posting the notice."

The parties to this litigation apparently concede that

what constitutes compliance with the statutory requirement that

the appropriator must " * * * proceed to prosecute the excavation

or construction of the work * * *" within 40 days after posting

the notice of appropriation under section 89-811 has never been the subject of direct interpretation by this Court. DNR relies on the language of the statute, dictionary definitions of the words used, analogies drawn from Montana cases and those from other states interpreting statutes relating to oil and gas drilling operations, water wells, and priorities under mechanics lien laws to support its contention that Intake's activities were at most preliminary work and do not rise to the level of excavation or construction of the work by which the water is to be diverted. Intake, on the other hand, equally relies on the statutory language, contends it must be reasonably applied in view of the magnitude of the project and the legal and practical hurdles that must be overcome, and refers us to a number of Colorado cases wherein similar decrees to that entered in the instant case have been granted to provide the necessary assurances in multi-million dollar projects of great magnitude, complexity and completion time. See Taussig v. Moffat Tunnel Water & Development Co. (1940) 106 Colo. 384, 106 P.2d 363; Metropolitan Suburb. Water v. Colorado River Water (1961) 148 Colo. 173, 365 P.2d 273; Four Counties Water Users Ass'n v. Colorado River Water C.D. (1966) 159 Colo. 499, 414 P.2d 469; Colorado River Water Conservation Dist. v. Twin Lakes R. & C. (1970) 171 Colo. 561, 468 P.2d 853; Elk-Rifle Water Company v. S. H. Templeton (1971) 173 Colo. 438, 484 P.2d 1211; Colorado Water Cons. Dist. v. Twin Lakes R. & C. Co. (1973) 181 Colo. 53, 506 P.2d 1226.

Continuing with our overview, one further statute and an administrative regulation relating to the existence and nature of Intake's right must be noted. Section 89-867(4), R.C.M. 1947 as amended, defines an "Existing right" under the Montana Water Use Act of 1973 in this language:

"(4) 'Existing right' means a right to the use of

- 13 -

water which would be protected under the law as
it existed prior to July 1, 1973."

A rule of DNR, codified as section 36-2.14J(1)-S1400 of the

Montana Administrative Code, further provides:

"(e) 'Existing right', in addition to the
definition given the term by section 89-867(4)
of the Act, includes any appropriation of water
commenced prior to July 1, 1973, if completed
according to the law as it existed when the
appropriation was begun."

One further matter is material to an overview of this

appeal.  The findings of fact and conclusions of law of the

district court contain this recital:

"Upon conclusion of the trial of this case, and
in response to an inquiry from the court, counsel
for the plaintiff, Mr. Chronister, conceded that
defendant had proved that it had posted its Notice
of Water Right Appropriation for Posting and filed
its Notice of Water Right Appropriation for Filing
in accordance with the provisions of Section 89-
810, R.C.M. 1947, and related statutes, and that
Intake had prosecuted excavation or construction
of the work by which the water is to be diverted
with reasonable diligence at all times since
expiration of the forty (40) day period specified
in Section 89-811, R.C.M. 1947, and to the date of
trial hereof.  Mr. Chronister stated that the only
remaining issue is the contention of the plaintiff
that the defendant did not commence to prosecute
excavation or construction of the work by which
the water is to be diverted within forty (40) days
after posting of the Notice of Water Right Appro-
priation for Posting as required by the provisions
of Section 89-811, R.C.M. 1947."

We now direct our attention to the first issue on appeal,

viz., is Intake the owner of a valid appropriation of 80,650

acre feet per year of the water of the Yellowstone River as of June

8, 1973?

The statutory requirements for a valid appropriation are:

(1) Posting a written notice of appropriation at the point of

intended diversion.  Section 89-810.  (2)Filing the notice of

appropriation with identification of the stream and point of di-

version.  Section 89-810. (3) The appropriator must proceed to

prosecute the excavation or construction of the work by which

- 14 -

the water appropriated is to be diverted within 40 days after posting notice of the appropriation. Section 89-811. (4) The appropriator must thereafter prosecute such work with reasonable diligence to completion. Section 89-811. If the appropriator completes the appropriation according to statute, the right to the use of the water relates back to the date of posting notice of the appropriation. Section 89-812.

Completion of all these steps is necessary to a complete appropriation. Bailey v. Tintinger, (1912), 45 Mont. 154, 122 P. 575. A declaration of appropriation, unaccompanied by construction of a diversion works and actual diversion of the water, is insufficient. Miles v. Butte Electric and Power Company (1905) 32 Mont. 56, 79 P. 549. Thus the posting and filing of the notice of appropriation is a condition precedent to a valid appropriation, and a valid appropriation does not exist without completion of the work and actual diversion of the water.

However, Intake is the owner of an "existing right" as that term is defined in the Water Use Act of 1973 and the Montana Administrative Code for the reasons and under the authority of General Ag. Corp. v. Moore, 166 Mont. 510, 534 P.2d 859. There we held that priority of appropriation of water is a valuable right within the meaning of Article IX, Section 3, 1972 Montana Constitution, recognizing and confirming all existing rights to the use of any waters for any useful or beneficial purposes and that the Water Use Act of 1973 discloses a legislative intent consistent with this Constitutional provision. In General Ag. Corp. we held that "use" is not limited to perfected or actual use but that the inception of the existing right occurs when the first step is taken to establish such use, otherwise the existing right of priority of appropriation would be nullified.

Nonetheless the "existing right" possessed by Intake is

not synonymous with a valid appropriation. What Intake possesses is essentially an uncompleted appropriation. Its "existing right" will not ripen into a valid appropriation until the remaining statutory requirements for a completed appropriation are met. No valid appropriation is yet in existence. Accordingly we hold that at this time Intake is not the owner of a valid appropriation of 80,650 acre feet per year of the waters of the Yellowstone River as of June 8, 1973.

The principal battleground at the trial was whether Intake had complied with section 89-811, R.C.M. 1947, requiring that it " * * * proceed to prosecute the excavation or construction of the work by which the water appropriated is to be diverted * * *" within 40 days after posting the notice of appropriation on June 8, 1973. This was stated by DNR's counsel at the beginning of the trial to be the only issue in DNR's case. At the conclusion of the trial counsel for DNR conceded that Intake had proved posting and filing of the notice of appropriation in accordance with section 89-810 and that Intake had prosecuted excavation or construction of the work by which the water is to be diverted with reasonable diligence at all times since expiration of the 40 day period specified in section 89-811 to the date of trial.

The focus of this issue is the meaning of the words " * * * proceed to prosecute the excavation or construction of the work * * *". In construing a statute, the intention of the legislature is controlling. Section 93-401-16, R.C.M. 1947. The intention of the legislature must first be determined from the plain meaning of the words used, and if interpretation of the statute can be so determined, the Court may not go further and apply any other means of interpretation. Keller v. Smith, _____Mont._____, 533 P.2d 1002, 33 St.Rep. 828; Dunphy v. Anaconda

- 16 -

Co., 151 Mont. 76, 438 P.2d 660, and cases cited therein. The words employed are to be given their ordinary and popular meaning unless the context or usage indicates otherwise. Beer R. P. Ass'n v. State Bd. of Equalization, 95 Mont. 30, 25 P.2d 128; Burritt v. City of Butte, 161 Mont. 530, 508 P.2d 563.

Both parties concede that this Court has not heretofore been called upon to construe the meaning of the statutory phrase in issue here. Both rely on dictionary definitions, drawing analogies from cases from other states construing their requirements and extrinsic indications of various kinds. Fundamentally, DNR contends that the statutory phrase requires actual on-site excavation or construction within 40 days of posting notice of appropriation and that drilling 5 test holes along a tentative pipeline to determine whether the diversion site selected is capable of supporting the diversion works does not qualify. Intake, on the other hand, contends that all of its activities during the 40 day period are part of its ongoing program to construct the project and that the legal and practical constraints on its activities by environmental requirements of the National Environmental Policy Act, the Yellowstone River Compact and section 89-846, R.C.M. 1947, Montana's Major Facilities Siting Act, the terms of its license from the Bureau of Reclamation, and prudent engineering and financial practices in a project of this size, complexity and magnitude preclude actual on-site excavation and construction of the diversion works within the 40 day period.

"Proceed" is defined in Webster's New Twentieth Century Dictionary (2d ed), in this manner:

> "To move, pass or go, forward or onward; to advance;
> * * * to continue or renew motion or progress; as
> to proceed on a journey; to proceed with an argument.
>
> " * * *
>
> "To go on in an orderly or regulated manner, to

begin and carry on a series of acts or measures;
to act by method; to prosecute a design; as, to
proceed on sound principles."

"Prosecute" is defined in the same dictionary as:

"To follow or pursue with a view to reach, execute
or accomplish; to carry on; to continue; to follow
up; to go or proceed with; as to prosecute a scheme,
hope or plan."

Application of these dictionary definitions goes only
part way in interpreting the meaning of the statutory phrase.
It can fairly be said that selection, staking, flagging, and
drilling of the 5 test hole borings at the site of the diversion
works; the securing of a license from the Bureau of Reclamation
to operate and maintain a pumping plant at the diversion site; the
filing and prosecution of the suit in state court to determine
if Intake must comply with the Montana Major Facility Siting Act
and the federal suit to determine the constitutionality of section
89-846, and Article X of the Yellowstone River Compact; the on-
going drafting of preliminary engineering plans for construction
of the diversion works, the environmental contacts, the selecting,
pricing and availability of equipment for the diversion works,
and the ongoing legal and administrative work indicate that Intake
was proceeding to prosecute the project during the 40 day period.
But these dictionary definitions shed no light on whether actual
on-site excavation or construction is required in the 40 day
period.

We note that the legislature used the phrase "proceed to
prosecute" rather than "commence actual excavation or construc-
tion". Section 89-811 was first enacted in 1885 in territorial
days prior to statehood. While it may have been the common
practice in those days to post the notice of appropriation, hitch
the horse to a ditcher, run a ditch and actually apply water to
a beneficial use within 40 days, the early settlers foresaw
irrigation projects of greater magnitude and used the statutory

- 18 -

language that still exists. This same statutory language has been retained and reenacted in 1887, 1895, 1907, 1921 and continues unchanged to the present time.

If the legislature had intended to require actual on-site excavation or construction it could easily have said so as it did in section 89-121, R.C.M. 1947, relating to storage, diversion and control of unappropriated waters by the State Water Resources Board, the predecessor of DNR. Section 89-121, R.C.M. 1947, authorized the State Water Resources Board to initiate rights to the use of waters by executing a declaration of intent to store, divert or control the unappropriated waters of a particular body, stream or source. Such a declaration was to have a priority of right as of the date of recording of the declaration with the county clerk and recorder " * * * provided the means of actual appropriation shall be commenced by <u>actual work of construction</u> within four (4) years from the date of original recording. * * *" (Emphasis supplied.)

A statute must be given a reasonable construction consistent with its purpose. Keller v. Smith, supra and authorities cited therein. The purpose of section 89-811 is to require reasonable diligence in completing the appropriation or forfeiture of the priority of the appropriation as of the day of posting the notice of appropriation. What constitutes reasonable diligence must be determined on an ad hoc, case-by-case basis. The law in this area is summarized by a leading authority, Clark, Waters & Water Rights, Vol. 6, §514.1, pp. 308, 309, in this language:

> "What constitutes due diligence is a question
> of fact to be determined by the court in each
> case. Diligence does not require unusual or
> extraordinary effort, but it does require a
> steady application of effort--that effort that
> is usual, ordinary and reasonable under the
> circumstances. * * * So long as the applicant
> prosecutes the construction of works in good
> faith with a steady effort, he should be held to

- 19 -

have prosecuted with diligence."

In the present case we have a multi-million dollar project of great complexity and magnitude that will require several years to complete. Removal of actual and potential legal constraints arising out of Article X of the Yellowstone River Compact, section 89-846, and Montana's Major Facility Siting Act are in progress. Actual on-site construction of the diversion works cannot be prosecuted until the environmental requirements of the National Environmental Policy Act are completed and the consent of the United States is obtained under the terms of Intake's license. Ordinary and prudent engineering practices require much preliminary engineering work to be completed before actual construction of the project is undertaken, bids are let, and the contractor moves in. It would be sheer folly to commence the actual excavation and construction of the diversion works before completion of these prior steps which is impossible within the 40 day statutory period following posting of notice of appropriation.

DNR refers us to several cases from Montana and elsewhere by way of analogy in support of its contention that commencement of actual construction of the diversion works within the 40 day statutory period is required. Solberg v. Sunburst Oil & Gas Co., (1925), 73 Mont. 94, 104, 235 P. 761, interprets the phrase "commencing drilling operations" in an oil and gas lease to " * * * denote unmistakably the first movement of the drill in penetrating the ground. * * *" and work preliminary thereto did not constitute compliance. State of Arizona v. U. S. Land Company (1966), 3 Ariz.App. 167, 412 P.2d 736, involved interpretation of the words "substantially commenced" in Arizona's Water Code dealing with construction of ground water wells and held that preliminary work was insufficient compliance. Rupp v.

Earl H. Cline & Sons, Inc. (1963), 230 Md. 573, 188 A.2d 146,
1 ALR3d 815, dealt with priorities under Maryland's mechanic's
lien laws after construction has commenced and held that "com-
mencement of a building" meant actual construction with a present
intention to continue the work until completion of the building.
North Shaker Boulevard Co. v. Harriman Nat. Bank, (1924) 22
Ohio App. 487, 153 N.E. 909, held that the digging of a test
hole was insufficient compliance with the statutory requirement
that "work, construction and improvements were begun" under
Ohio's mechanic's lien statute.  Arkansas Power & Light Co. v.
Federal Power Com'n, (1942), 125 F.2d 982, held that a federal
power licensee who was required to commence actual construction
of a project within a specified period had not complied with the
terms of his license by excavating several thousand yards of
dirt, clearing, grading, surveying, and construction of a road
as this was simply preliminary work incidental to the actual
construction and not a part of actual construction.

    We do not consider these attempted analogies in point
concerning interpretation of the Montana statute.  They involve
entirely different statutory language under statutes whose pur-
pose is dissimilar from that of our statute.  Under these cir-
cumstances, we fail to see how they aid in interpreting and con-
struing the meaning of our statutory language.

    We hold therefore that the meaning of the words " * * *
proceed to prosecute the excavation or construction of the work
by which the water appropriated is to be diverted * * *" is not
confined to the commencement of actual on-site excavation or
construction of the diversion works, but that it encompasses
the steady on-going effort in good faith by Intake to prosecute
the construction of the project under the circumstances disclosed
here.

    The final issue is whether equitable and public policy

considerations preclude Intake from claiming an inchoate right to appropriate 80,650 acre feet per year of the waters of the Yellowstone River.

The gist of DNR's argument on this issue, as we understand it, is that the judgment here constitutes a judicial stamp of approval of Intake's project for an indefinite or open-ended term of years; that the judgment is contrary to the letter and spirit of prior and existing water law of this state in that it places in a state of limbo the rights of the people of Montana and subsequent appropriators to the beneficial use of over 80,000 acre feet per year of the waters of the Yellowstone River; that Intake's project is contrary to public policy and should not be approved because of the substantial number of legal and practical hurdles that must be overcome to make this project a reality which render it highly speculative, indefinite and uncertain and further that the intended use of the water is contrary to the purposes of the Yellowstone River Compact; and that the entry of similar decrees in Colorado is not in point because Colorado statutes authorizing conditional decrees with periodic judicial review have no counterpart in Montana.

Intake's contentions, on the other hand, are that DNR's concern over the effect of the judgment on the people of Montana and subsequent appropriators is unwarranted because the amount of the appropriation amounts to less than 1% of the mean annual flow of the river at the point of diversion and there would be a negligible effect on the river itself and subsequent appropriators and in reality would benefit the people of Montana by putting a small portion of the 8.8 million acre feet of surplus waters of the Yellowstone River to beneficial use; that the validity of Intake's appropriation is not in limbo for an indefinite and open-ended term because Intake has an existing right from June 8,

1973 under General Ag. Corp. v. Moore, 166 Mont. 510, 534 P.2d 859; that while a number of legal and practical hurdles exist before Intake's project can become a reality, such considerations do not render the project so indefinite and speculative as to strike down the project from the outset and preclude Intake's efforts to complete it; that Intake is entitled to litigate the constitutionality of the Yellowstone River Compact; and that the Montana Declaratory Judgment Act furnishes sufficient legal foundation for entry of the judgment here without specific authorization for conditional water decrees as in Colorado.

The direct answer to this issue is that there is nothing illegal, inequitable, or contrary to public policy so as to preclude Intake from claiming a right to appropriate 80,650 acre feet of water per year of the waters of the Yellowstone River. Intake has an existing right for the reasons and under the authorities previously cited. While this existing right does not constitute a valid and completed appropriation, it entitles Intake to pursue its project with reasonable diligence to that end for the reasons and under the statutes and case law heretofore discussed. The fact that final determination of the validity of Intake's appropriation may be years away does not place the rights of the people of Montana or subsequent appropriators in limbo for an indefinite and open ended term to any greater extent here than in any other case involving a multimillion dollar project of great magnitude and complexity which is clearly not prohibited. Intake, as well as any other person or business organization, has the right to litigate the constitutionality of any law including Art. X of the Yellowstone River Compact, section 89-846, R.C.M. 1947, and the applicability of the Major Facility Siting Act. Considerations of equity and

- 23 -

public policy in no way preclude this. The Montana Declaratory Judgment Act authorizes the instant action. It provides in pertinent part in section 93-8902, R.C.M. 1947:

> "Any person * * * whose rights, status or other legal relations are affected by a statute * * * may have determined any question of construction or validity arising under the * * * statute * * * and obtain a declaration of rights, status or other legal relations thereunder."

It further provides in section 93-8912, R.C.M. 1947:

> "This act is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and it is to be liberally construed and administered."

Paragraphs numbered 1, 2 and 3 of the Judgment and Decree do this precisely. They adjudicate Intake's rights and status in relation to its proposed project and activities to the date of trial under Montana water appropriation statutes.

However, paragraphs numbered 4 and 5 of the Judgment and Decree go considerably beyond this and must be stricken.

Paragraph 4 provides:

> "4. In the event it is ultimately and finally determined in the action now pending in Lewis and Clark County, Montana, Civil Docket No. 36907, or any appeal stemming therefrom, that Intake is subject to and must comply with the provisions of the Montana Major Facility Siting Act of 1973, as amended, in the construction of its diversion works on the Yellowstone River in Dawson County, Montana, any actions taken by Intake to comply with the provisions of the Montana Major Facility Siting Act of 1973, as amended, shall constitute prosecution of construction of the work by which the water appropriated June 8, 1973, is to be diverted, which, if prosecuted with reasonable diligence to its completion entitles Intake to relate back the priority of its appropriation of the waters of the Yellowstone River in Dawson County, Montana, to the date of posting of the Notice of Water Right Appropriation for Posting under Sections 89-811 and 89-812, R.C.M. 1947, to-wit: June 8, 1973."

This provision purports to adjudicate Intake's rights and status under a future hypothetical contingency that may or may not

- 24 -

occur. It does not require diligent prosecution of the action to completion by Intake. It grants to Intake a "carte blanche" for any actions it may take thereafter to comply, without definition or limitation, without regard to reasonableness, and under unknown facts that may occur or circumstances that may exist in the future. A determination of whether Intake, following the date of this trial, has continued to prosecute its project with reasonable diligence is a question of fact under the authorities previously cited. That determination must be made on the basis of known and proven facts at the time of trial, in such context, and under the totality of facts and circumstances then existing. It cannot and should not be adjudicated at this time.

Paragraph 5 provides:

"5. Intake's appropriation of June 8, 1973, is complete as of June 8, 1973 to the full amount of water its facilities are capable of diverting from the Yellowstone River, (but not exceeding 80,650 acre feet per year), for sale, rent or distribution for agricultural, industrial, municipal and domestic purposes, (and for each of such purposes), when its diversion works and off-stream reservoir are completed, and Intake is ready and willing to deliver water to users upon demand and offers to do so."

The same comments apply to this paragraph. In addition, the language of this paragraph can be interpreted as granting Intake an accrued appropriation as of June 8, 1973 by use of the word "is" rather than "will be". As previously discussed, Intake simply possesses an uncompleted appropriation at this time.

What has been decided here today is that Intake has complied with Montana water appropriation statutes to the date of trial and upon completion of compliance with statutory requirements, Intake's "existing right" of priority of appropriation will ripen into a completed appropriation as of June 8, 1973. Whether future activities of Intake under hypothetical contingencies

- 25 -

and in the light of unknown future events qualifies must await future determination. DNR, in its continuing administration of Montana's water use laws, can monitor Intake's future activities and initiate action to terminate Intake's right of priority of appropriation at any time Intake ceases to prosecute its project with reasonable diligence to completion and thereby subject Intake to the provisions of Montana's Water Use Act of 1973.

It has been held and we approve of the following statement of the principles applicable under the Uniform Declaratory Judgment Act:

> "The courts have no jurisdiction to determine matters purely speculative, enter anticipatory judgments, declare social status, deal with theoretical problems, give advisory opinions, answer moot questions, adjudicate academic matters, provide for contingencies which may hereafter arise, or give abstract opinions. (Citing cases.) 'The Uniform Declaratory Judgment Act does not license litigants to fish in judicial ponds for legal advice.'" Little v. Wachovia Bank and Trust Company, 252 N.C. 229, 113 S.E. 2d 689. Also see Indiana Alcoholic Beverage Commission v. Deets, 133 Ind.App. 444, 179 N.E.2d 217.

The judgment and decree of the district court is modified by striking paragraphs numbered 4 and 5 therein. All conclusions of law on which said paragraphs are based are stricken or modified in conformity with this opinion.

We have considered the peripheral arguments and contentions of the parties and find it unnecessary to comment on them in this opinion as none would alter our decision herein.

The judgment and decree of the district court as modified is affirmed.

_____
                                Justice

We concur:

_James T Harrison_
Chief Justice

_John Conway Harrison_

Justices

_Jack D. Shanstrom_
Hon. Jack Shanstrom, District
Judge, sitting in place of Mr.
Justice Wesley Castles.