No. 84-20

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

_____

THE COMMITEE FOR AN EFFECTIVE JUDICIARY;
ARTHUR M. MARTIN, CARL M. DAVIS, JEAN
BOWMAN, ROBERT S. KELLER, et al.,

        Petitioners,

   -vs-

STATE OF MONTANA, and JAMES
WALTERMIRE, Secretary of State,

        Respondent.

_____

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

    For Petitioners:

        Larry M. Elison and James Goetz argued, Missoula,
        Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Judy Browning argued, Asst. Atty. General, Helena

_____

        Submitted: March 6, 1984

          Decided: April 3, 1984

Filed:    APR    1984

                         _Ethel M. Harrison_

_____
                        Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Petitioners are all registered voters in this state. This Court assumed jurisdiction of petitioners' original petition for declaratory judgment that we hold sections 3-1-607 and 3-1-608, MCA, unconstitutional because they conflict with Art. VII, § 10 of the Montana Constitution. Unless a district judge or supreme court justice resigns his office, these statutes prevent a district judge from running for any supreme court position, and they also prevent a justice of the supreme court from running for the position of chief justice. (See Appendices A and B for the full text of these statutes.) Art. VII, § 10 of our Constitution sets forth two circumstances in which judicial office is forfeited. It provides:

"Any holder of a judicial position forfeits that position by <u>either</u> filing for an elective office other than a judicial position <u>or</u> absenting himself from the state for more than sixty (60) consecutive days." (Emphasis added).

Petitioners contend that this constitutional provision clearly authorizes a district judge to file for elective office to the supreme court and a justice of the supreme court to file for the position of chief justice -- without resigning from office to do so.

This is an election year and two supreme court positions must face the election process: the office of chief justice, and the office of position number three (3), now occupied by the author of this opinion. The deadline for filing judicial nominations is April 16, 1984. Because of the importance of the question and time exigences imposed by the nominating deadline, this Court assumed jurisdiction. In our order

- 2 -

assuming jurisdiction we asked that the parties file briefs not only on the constitutional questions raised, but also on the question of whether the petitioners have standing to challenge the constitutionality of the statutes.

Although other constitutional issues are raised attacking the statutes, petitioners' primary contention is that sections 3-1-607 and 3-1-608, MCA, conflict with Art. VII, § 10 of our Constitution, and therefore must be voided. In addition to their alleged standing as registered voters, petitioners also allege that standing exists because of: (1) the presence of a district judge (Arthur B. Martin) as one of the petitioners; (2) the presence of seven lawyers as petitioners; and (3) the presence of three petitioners who were members of the 1972 Constitutional Convention that drafted and passed Art. VII, § 10, later ratified by the people of this state as part of their adoption of a new constitution.

Although the State conceded at oral argument that it would be in the public interest to decide the constitutional question on the merits, the State nonetheless steadfastly adhered to its position that no standing exists regardless of the status of petitioners. We need not discuss each of the contentions because we hold that standing, under the facts of this case, exists because the petitioners are registered voters and the statutes involved adversely affect the election process contemplated by the 1972 Montana Constitution. We hold also that sections 3-1-607 and 3-1-608, MCA, are unconstitutional because they are in direct conflict with Art. VII, § 10 of the Montana Constitution.

I. STANDING - REGISTERED VOTER

The State argues that a registered voter is not sufficiently affected by the statutes because the statutes do not deprive the voter of his right to vote in the election but merely provide that a district judge or a supreme court justice cannot be one of those candidates for whom the voter can cast his ballot. To create standing in a registered voter, the State argues, three conditions must be met: (1) a sitting district judge or supreme court justice must declare that he would run for another judicial office; (2) the judge must decline to file because of the automatic resignation provisions of sections 3-1-607 and 3-1-608, MCA; and (3) the voter must declare his intent to vote for that particular person. Absent these conditions, the State argues that the injury to the registered voter is too speculative. Where the public and the electorate were so clearly intended to benefit by a constitutional provision, we hold that a registered voter has standing to assert that public interest by contending that the constitutional provision has been the victim of legislative strangulation.

The 1972 constitutional delegates, in considering what is now Art. VII, § 10, of the judicial article, were primarily motivated by the public interest to be served by permitting district judges to run for the Supreme Court and for a justice of the supreme court to run for chief justice -- without having to forfeit their judicial office. The concern of the delegates was not to confer benefits on the judiciary nor on individual members of the judiciary. Rather, their concern was for the health of the judicial system itself -- for the public interest.

At the time of the 1972 Constitutional Convention, section 3-1-607, MCA (formerly section 93-219, R.C.M. 1947)

- 4 -

was in effect, and it appears that the delegates in charge of the judicial article favored a prohibition similar to the statute. The original proposal required district judges and supreme court justices to resign from office if they filed for any elective office other than their own. The original provision submitted to the full convention, provided in part: "Filing for another elective office results in forfeiture of judicial position . . ." (Tr. 1972 Constitutional Convention, Vol. I at 512.) However, several delegates immediately questioned the wisdom of this provision once they learned that it was intended to prevent district judges from running for the supreme court and supreme court justices from running for chief justice -- unless they resigned from office. (Tr. 1972 Constitutional Convention, Vol. IV, at 1148-1158.) Several delegates argued that the judicial system would benefit by enabling district court judges and supreme court justices to run for judicial office other than their own without forfeiting their own office. (Tr. 1972 Constitutional Convention, Vol. IV at 1149.) Based on these arguments, the article was amended to reflect that thinking.

The first version of the amendment that was voted on was more precise but longer than the version finally adopted. The first version provided in part that "Filing for another elective public office results in forfeiture of a judicial position, but a judge may file for another judicial position without forfeiture of the judicial position he holds." (Tr. 1972 Montana Constitutional Convention, Vol. IV at 1149.) With no debate this version was voted on and passed by a vote of 88 to 2. This version was then sent to the style and drafting committee for final revision as to form. The final version came out of the style and drafting committee, changed

as to form only, and with no further debate on the merits, the delegates voted to adopt this version, which is now part of our 1972 Constitution. The integrity and supremacy of this provision is the basis for the case now before us. It reads:

> "Any holder of a judicial position forfeits that position by either filing for an elective office other than a judicial position or absenting himself from the state for more than sixty (60) consecutive days." (Art. VII, § 10.)

This constitutional provision was motivated by the belief of the delegates that the public interest would be served by a provision that would permit judges to seek various levels of judicial office through the elective process without first suffering a forfeiture of their own office. We must, therefore, recognize that a public interest exists, apart from the desires of individual district judges or supreme court justices, to assert the integrity and supremacy of this constitutional provision voted on and passed by the delegates and later voted on and ratified by the people of this state. We hold that a registered voter has the standing to make this assertion.

Standing questions cannot often be decided by hard and fast rules because of the varying complexity and importance of questions that come before the courts. We recognized in Stewart v. Board of County Commissioners of Big Horn County (1977), 175 Mont. 197, 573 P.2d 184, that standing questions must be viewed in part in light of "discretionary doctrines aimed at prudently managing judicial review of the legality of public acts . . ." 175 Mont. at 200, 573 P.2d at 186. Where discretion is involved hard and fast rules cannot be the decisive factors. The importance of the question to the

- 6 -

public surely is an important factor, and this is why in State ex rel. Sego v. Kirkpatrick (N.M. 1974), 524 P.2d 975, the New Mexico Supreme Court recognized that private parties should be granted standing to contest important public issues. The Court said:

"[T]his court in its discretion, may grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance." Sego, supra, 524 P.2d at 979.

The Sego case involved the validity of a partial veto exercised by the governor of New Mexico. The court granted standing to petitioner, as an elector and taxpayer, to contest the legality of the governor's action. See also State ex rel. Howard v. Oklahoma Corporation Commission (Okla. 1980), 614 P.2d 45, where the Oklahoma Supreme Court, relying in part on the Sego case, looked mostly to private citizen petitioners to grant standing to assert that a state commission had failed to comply with an Oklahoma statute. In Howard, the petitioners sought and obtained a peremptory writ of mandamus compelling the state commission to comply with the Oklahoma statute. Nor should we ignore the rights of citizens to assert the public interest in challenging the legality of legislative action that allegedly flies in the face of our state constitution. That is particularly so where the constitutional provision is intended to benefit the public as a whole rather than classes of individuals--such as judges. The constitutional provision invoked here was not intended to confer special privileges on the judiciary or on individual judges. Rather, it was intended to give the public a potentially broader choice in exercising its constitutional right to vote for judicial candidates.

This Court has been keenly sensitive to the constitutional rights of voters. Although the case is not in point factually or legally, we clearly recognized in Jones v. Judge (1978), 176 Mont. 251, 577 P.2d 846, that a special interest exists in a registered voter whose vote may be denied by legislation. We said:

> "The right to vote, however, is a personal and constitutional right. Although stature as an elector will generally not allow an individual to bring an action invoking the judicial power, an elector who is denied this right is sufficiently affected to invoke the judicial power to challenge the validity of the Act which denies him the right." 176 Mont. at 254, 577 P.2d at 848.

In Jones the right of registered voters to vote for judicial candidates was completely denied by operation of the challenged statutes. Here the registered voters would not be completely denied their right to vote for judicial candidates running for the offices that are open to the elective process this year. But the operation of the challenged statutes does deny the voters their right to vote for a class of judicial candidates that allegedly is expressly permitted by Art. VII, § 10, of our Constitution to be candidates for other judicial offices. Unlike Jones, the registered voters here, in addition to asserting their constitutional right to vote, are asserting the constitutional supremacy of a provision that expressly opens the judicial elective process to all judges who would file for another office--without suffering forfeiture of their own office. At a minimum, the right of registered voters to vote for judicial candidates coming from the ranks of judges, would be diminished. Practically speaking, the right would be effectively denied. Rare is the judicial candidate who would forfeit his judicial office by running for another judicial office.

The constitutional delegates clearly intended the Montana electorate to be the beneficiaries of a judicial elective process permitting all judges to file for other judicial office provided they are otherwise qualified. The challenged statutes have not only chilled that process, they have essentially frozen that process by making it a virtual certainty that judges would not run for other judicial office at the risk of automatic forfeiture of their office by the mere act of filing for other judicial office. The electorate has been effectively denied a right to a potentially broader selection of judicial candidates. Just as clearly, a registered voter must be recognized as having the standing to assert that the challenged statutes have diminished his constitutional right to vote.

## II.  UNCONSTITUTIONALITY OF SECTIONS 3-1-607 and 3-1-608,MCA

The parties differ in their interpretation of the key language of Art. VII, § 10, which provides that "Any holder of a judicial position forfeits that position by . . . filing for an elective office other than a judicial position. . ." (Emphasis added.)  This provision applies to all judges in this state.  The challenged statutes, however, (sections 3-1-607 and 3-1-608, MCA) prevent only district judges and supreme court justices from seeking other judicial office without forfeiting their office.  The constitutional delegates, in drafting Art. VII, § 10, did not intend that a forfeiture of office would result if a judge filed for "other" judicial office.  The State, however, interprets Art. VII, § 10, as creating a vacuum into which the legislature was clearly empowered to move and to enact the statutes declaring a forfeiture of judicial office when district

- 9 -

judges and supreme court justices file for other judicial office.

The petitioners rely not only on the language of Art. VII, § 10, but also on the record of the constitutional proceedings which clearly establishes the intent of the delegates to permit judges to file for other judicial office without forfeiting their own offices. Forfeiture of office was intended as the result only when a judge filed for a legislative or executive position. (See Part I, supra.) The State concedes that the delegates had this intent, but nonetheless argues that the delegates somehow drafted a provision that did not reflect this intent. The State argues that this Court is bound by what was drafted rather than by what was intended. The State's interpretation of Art. VII, § 10, would permit the legislature to enact the forfeiture sanctions imposed by the challenged statutes.

According to the State, Art. VII, § 10, does not declare what happens if a judge files for a judicial position--it only declares that a forfeiture results if a judge files for a nonjudicial office. Because the provision does not affirmatively declare that judges can file for "other" judicial office without suffering forfeiture of their own office, the State contends that the legislature may step into this vacuum and enact laws declaring what does happen when a judge files for "other" judicial office. With this as its premise, much of the State's brief is devoted to the theoretical basis on which it believes the legislature has the authority to enact so-called "resign to run" statutes. The cases cited in this analysis, however, do not apply to a situation where the question turns on the interpretation to be given to a "resign to run" <u>constitutional</u> provision.

The question, of course, involves the interpretation to be given Art. VII, § 10. The State argued in its briefs that no ambiguity in the language exists and that its interpretation is the only reasonable one. Yet, in oral argument before this Court, the State conceded that petitioners' interpretation of Art. VII, § 10, is a reasonable one. Despite this concession of two diametrically opposed "reasonable" interpretations of the constitutional provision, the State refused to concede that an ambiguity exists that can be resolved only by reference to the record of the constitutional proceedings. The record, of course, supports the petitioners' interpretation of the constitution.

The constitutional prohibition against judges seeking nonjudicial offices while still holding judicial office is but part of a general constitutional scheme declaring directly or indirectly the rights of office holders in all branches of government to seek other office while still holding office. The legislative article (Art. V) does not expressly mention whether a legislator can file for another elective office without forfeiting his legislative office, but Art. V, § 9, indirectly places restrictions on "other" office holding. It further prohibits a member of congress or a public office holder in this state from simultaneously holding office as a legislator. The executive article (Art. VI, § 5(2)) expressly provides that executive office holders ". . . may be a candidate for any public office during his term." (Emphasis added.)

The judicial article is clearly the most restrictive—it imposes severe sanctions on office-seeking by judicial office holders. Any judge holding office in this state forfeits his office if he files for any office—"other than a judicial

- 11 -

position." (Art. VII, § 10, supra.) Though it does not mention filing for a legislative or an executive office, the crystal clear message of this provision requires a judge to forfeit his judicial office if he files for either a legislative or an executive office. It is equally clear, however, that the constitutional delegates did not intend a forfeiture of judicial office to result if a judge filed for "other" judicial office. The language, "other than a judicial position," shows that the delegates intentionally left the door open for judicial office holders to file for other judicial office without forfeiting their offices as a condition to seeking other judicial office through the election process.

The State's position would permit the legislature to close a door which the constitutional delegates intentionally left open. The door was left open because the delegates perceived a public benefit in opening up the judicial election process to judges who desired to move from lower courts to the district court and from district court to the supreme court, or from a justice on the supreme court to a chief justice on the supreme court. (See Part I, supra.) While Art. VII, § 10, does not affirmatively declare that judicial candidates can run for other judicial office without incurring forfeiture of their own office, its intent is sufficiently clear. To say that a judge forfeits his office if he files for a non-judicial office is but another way of saying that a sitting judge can file for other judicial office without forfeiting his office.

Sections 3-1-607 and 3-1-608, MCA, forbid what Art. VII, § 10, authorizes, and they are therefore in conflict with this constitutional provision. This opinion shall constitute

- 12 -

a declaratory judgment holding that sections 3-1-607 and 3-1-608, MCA, are unconstitutional.

The request for declaratory relief is granted.

_Daniel J. Shea_
Justice

We Concur:

_____
Chief Justice

_John Conway Harrison_

_John C. Sheehy_

_____

_____
Justices

APPENDIX A

"3-1-607. Supreme court justice or district court judge not to run for office--resignation required. (1) If a person occupying the office of chief justice or associate justice of the supreme court or judge of a district court of the state of Montana becomes a candidate for election to any elective office under the laws of the state of Montana, he shall immediately, and in any event at or before the time when he must file as a candidate for such office in any primary or special or general election, resign from his office of chief justice, associate justice, or district judge.

- 13 -

"(2) The resignation becomes effective immediately upon its delivery to the proper officer or superior.

"(3) The resignation requirement applies except when the person is a bona fide candidate for reelection to the identical office then occupied by him or for another nonpartisan judicial office the term of which does not commence earlier than the end of the term of the office then occupied by him."


APPENDIX B


"3-1-608. Forced vacancy. In the event of a failure to resign, the office of chief justice, associate justice, or district judge automatically becomes vacant and the former occupant has no further right, power, or authority therein for any purpose and no right to any emoluments thereof, notwithstanding the fact that a successor is not appointed or elected. The vacancy becomes operative to deprive the person of the emoluments of the office in order to carry out the policy of this section and 3-1-607."

Mr. Chief Justice Frank I. Haswell, dissenting.

Today's majority opinion may arguably establish a good political policy, but it cannot be sustained under existing law.

The essence of the majority opinion on the standing of petitioners to bring this action is contained in a single sentence:

> "We need not discuss each of the conten-
> tions because we hold that standing,
> under the facts of this case, exists
> because the petitioners are registered
> voters and the statutes involved adverse-
> ly affect the election process contem-
> plated by the 1972 Montana Constitution."

In sum, I dissent on the following grounds: (1) There is no actual case or controversy to invoke the judicial power of this Court; (2) there is no injury or threatened injury to any of the petitioners by reason of the resign-to-run stat-utes that petitioners ask us to declare unconstitutional; and (3) the expansion of this Court's judicial power is a dangerous precedent that violates constitutional and statutory provisions of existing law.

Essentially this is an original petition seeking a declaratory judgment that the resign-to-run statutes are unconstitutional. Montana adopted the Uniform Declaratory Judgments Act in 1935. Under that Act a decision on the constitutionality of a statute cannot be obtained by a person who has no interest in the question except that of a "resi-dent, citizen, taxpayer and elector" Chovanak v. Matthews (1948), 120 Mont. 520, 526, 188 P.2d 582, 588. In Chovanak we held that the judicial power under this Act extends only to actual cases and controversies and not to abstract questions. Petitioners here seek to overturn this holding on

the grounds they are voters and that the acts in question adversely affect the election processes under the 1972 Montana Constitution.

We have previously construed Montana's Uniform Declaratory Judgments Act to prohibit the courts from determining speculative matters, entering anticipatory judgments, or providing for contingencies that may later arise:

> "It has been held and we approve of the following statement of the principles applicable under the Uniform Declaratory Judgment Act:
>
> "'The courts have no jurisdiction to determine matters purely speculative, enter anticipatory judgments, declare social status, deal with theoretical problems, give advisory opinions, answer moot questions, adjudicate academic matters, provide for contingencies which may hereafter arise, or give abstract opinions. (Citing cases) The Uniform Declaratory Judgment Act does not license litigants to fish in judicial ponds for legal advice.'" (Citing cases) (Emphasis added) Montana Department of Natural Resources and Conservation v. Intake Water Co. (1976), 171 Mont. 416, 440, 558 P.2d 1110, 1123.

The case at bar is a manufactured or contrived lawsuit. Petitioners admittedly are an ad hoc committee formed to prosecute this case. At oral argument counsel for petitioner stated: "This committee was formed for the express purpose of initiating this lawsuit to answer this question."

No individual on the committee is alleged to have any interest in running for judicial office. No sitting judge has expressed a desire to run for another judicial office. Under such circumstances this Court has no jurisdiction to determine the purely theoretical, abstract and academic question posed which owes its genesis to a hypothetical future contingency that may or may not arise.

Secondly, there is no injury or threatened injury to petitioners apart from the general public. This is a constitutional requirement of standing under both the United States and Montana Constitutions.

The Federal injury requirement has been found to stem from language in Art. III of the United States Constitution which limits judicial power to "cases" and "controversies." As recently summarized in Valley Forge Christian College v. Americans United for Separation of Church and State (1982), 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700, 709:

> " . . . at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant'. . . "

In Montana we have also held that our state constitution requires an actual "case" or "controversy" before the judicial power can be invoked. In a 1977 case, we held:

> "From these cases we synthesize that the issue presented for review must represent a "case" or "controversy" within the judicial cognizance of the state sovereignty. Additionally, the following minimum criteria are necessary to establish standing to sue a governmental entity: (1) The complaining party must clearly allege past, present or threatened injury to a property or civil right; and (2) the alleged injury must be distinguishable from the injury to the public generally, but the injury need not be exclusive to the complaining party." Stewart v. Board of County Commissioners (1977), 175 Mont. 197, 201, 573 P.2d 184, 186.

Only those adversely affected by a statute can challenge its validity. Jones v. Judge (1978), 176 Mont. 251, 577 P.2d 846.

A constitutionally grounded requirement of injury is not a discretionary matter which the court may require or dispense with at its option. Constitutional standing requirements are distinguishable from discretionary prudential limitations which the courts have fashioned to limit the number of cases they hear. In Stewart we recognized this distinction:

> "The concept of standing arises from two different doctrines: (1) Discretionary doctrines aimed at prudently managing judicial review of the legality of public acts, (citations omitted); and (2) doctrines of constitutional limitation in the federal courts drawn from the 'cases and controversies' definition of federal judicial power in Article III, United States Constitution and in the Montana courts drawn from the 'cases at law and in equity' definition of state judicial power in Article VII, 1972 Montana Constitution." 175 Mont. at 200, 573 P.2d at 186.

This distinction is crucial because courts are free to fashion exceptions to discretionary prudential limitations but not constitutional standing requirements which are mandatory. See generally, L. Tribe, American Constitutional Law at 100 (1978).

Here the flaw in petitioners' standing is that it presents only a hypothetical future contingency for determination which we have held insufficient to invoke the court's jurisdiction. Intake Water Co., supra. Petitioners here have alleged only that some judges may choose to run, i.e. that the statutes may be triggered by a hypothetical future event that may or may not occur. No past, present or future injury is alleged absent hypothetical future events or occurrences. There can be no injury to petitioners unless and until a sitting judge indicates a desire to run for another judicial office but for the resign-to-run statutes.

-18-

The following major cases in which resign-to-run statutes have been challenged reveal that in each case at least one of the petitioners alleged that he or she wanted to run for another office: Clements v. Fashing (1982), 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508; Bullock v. Carter (1972), 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92; Joyner v. Moffard (9th Cir. 1983), 706 F.2d 1523; Morial v. Judiciary Commission of the State of Louisiana (5th Cir. 1977), 565 F.2d 295; Henderson v. Fort Worth Independent School District (5th Cir. 1976), 526 F.2d 286. Although standing was not at issue in these cases, each court found it significant to note that one of the plaintiffs had expressed a desire to run for office.

I would hold as the United States Supreme Court held in Clements, supra, that to have a bona fide case or controversy, a plaintiff challenging a resign-to-run statute must allege that but for the sanctions of the statutes, he or she would engage in the very acts that would trigger enforcement of the statute

We followed the above analysis in Lee v. State (1981), 195 Mont. 1, 5, 635 P.2d 1282, 1284, wherein our opinion summarized Lee's complaint in this language:

> ". . . In his complaint, he alleges that he is a resident of Fort Shaw, Cascade County, Montana; that he frequently drives a motor vehicle on the highways of this state, particularly Montana State Highway No. 200 and Interstate Highway No. 15 between Fort Shaw and Great Falls, Montana; that the attorney general has issued the proclamation to which we have adverted; that except for such proclamation, he would be entitled to drive a motor vehicle under the provisions of section 61-8-303, MCA, (the basic speed rule) in excess of 55 miles per hour as he was accustomed to doing prior to the issuance of the proclamation ."

This language of the complaint was followed by the Court's observation that:

> ". . . Gary Lee is directly affected by the operation of the statute he attacks in this case. His right or privilege to drive a motor vehicle by the basic rule of safety under section 61-8-303, MCA, has been adversely limited by the enforcement or threatened enforcement of section 61-8-304, MCA. He wants to drive his motor vehicle as fast as the basic rule allows . . ." 195 Mont. at 7, 635 P.2d at 1285.

The majority, ignoring the Montana Constitution and Montana cases to the contrary, rely on a New Mexico case, State ex rel Sego v. Kirkpatrick (1974), 86 N.M. 359, 524 P.2d 975 and an Oklahoma case, State ex rel. Howard v. Oklahoma Corporation Commission (Okla. 1980), 614 P.2d 45 to grant standing to a private party to contest important public issues.

In my view, this in not a voting rights case. No voter has the right to vote for a potential candidate who does not choose to run. Montana's resign-to-run statutes restrict the conduct of judges, not the conduct of voters. These statutes no more affect the public interest or the rights of voters than statutes establishing qualifications for any elective office.

Finally, the majority today have set a far reaching and dangerous precedent in expanding the judicial power of our courts beyond the constitutional limitation of actual cases and controversies. The majority speaks of the public interest as justification for granting standing to adjudicate this controversy. The policies that underlie this constitutional limitation of standing are of equal importance to the public.

Petitioners want this Court to reach out and declare a legislative act unconstitutional simply because it allegedly affects the public interest and their constitutional rights as voters. Their constitutional rights as voters are not infringed absent the presence of a sitting judge who wants to run for another judicial office but for the statutes in question. The perceived public interest is a nebulous concept dependent on whose ox is being gored. The contention that public interest creates standing can be made against almost any legislative act and effectively eliminates constitutional standing requirements.

The issue presented in this case is purely hypothetical and academic. The majority opinion today establishes a precedent that will compel this Court and the district courts in future cases to file down this self-created primrose path like lemmings in their March-to-the-Sea.

I respectfully dissent. I would dismiss the petition for lack of standing.

Chief Justice

We join in the foregoing dissent of the Chief Justice.

Justice

Hon. Henry Loble, District Judge, sitting in place of Mr. Justice Frank B. Morrison, Jr-

-21-

Mr. Justice John C. Sheehy concurring:

I concur fully with the majority opinion and want to add an observation respecting suits of this nature by voters.

This Court has long recognized the standing of an elector who challenges the validity of an election or the alleged misuse of the elective process. From State ex rel. Clarke v. Moran (1900), 24 Mont. 433, 633 P. 390, through State ex rel. Steen v. Murray (1964), 144 Mont. 61, 394 P.2d 761, and down to the recent case of Jones and Herriott v. Judge (1978), 176 Mont. 251, 577 P.2d 846, this Court has guarded and granted standing to a voter whose personal and constitutional right to vote is denied, affected or threatened, holding that every patriotic citizen interested in the enforcement of the election laws, or the selection of suitable candidates has a direct personal interest which the courts will enforce on an individual basis.

John C. Sheehy
_____
Justice

-22-