PR 09-0639

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 285

_____

INQUIRY CONCERNING COMPLAINT OF:
JUDICIAL STANDARDS COMMISSION,                              O P I N I O N

    Complainant,                                              A N D

  v.                                                                        O R D E R

LEROY NOT AFRAID,

    Respondent.

_____

¶1  Following its inquiry into the complaint filed against Leroy Not Afraid (Not Afraid) by appointed prosecuting attorney, Geoffrey R. Keller (Keller), the Judicial Standards Commission (JSC) filed its recommendation with this Court. The JSC recommends that Not Afraid be sanctioned for violating the Montana Constitution and the Code of Judicial Conduct by a public reprimand and the imposition of proceeding costs. Not Afraid objects to the recommendation and requests dismissal of the complaint. Keller has responded to Not Afraid's objections. We conclude that the complaint must be dismissed. We state the dispositive issue as follows:

¶2  *Is the office of Crow Tribal Chairman an "elective public office" for purposes of Article VII, Section 10?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Not Afraid was duly elected Justice of the Peace for Big Horn County in November 2006, and he began his term of office on January 1, 2007. Pursuant to Article III, Section 3 of the Montana Constitution and § 3-10-202, MCA, he took the constitutional oath of office before assuming his duties.

¶4 Not Afraid is an enrolled member of the Crow Tribe of Indians. In March 2009, Not Afraid filed as a candidate for the office of Crow Tribal Chairman while maintaining his office as Justice of the Peace. The Crow Constitution and Law and Order Code define the Chairperson as an executive position. Crow Const. art. IV, § 1; Crow Law & Order Code. tit. 21, art. III, § 1(1) (2005). The JSC sent two letters to Not Afraid and his attorney, advising Not Afraid of the provision of Article VII, Section 10 of the Montana Constitution requiring a holder of a judicial position to forfeit that position upon filing for a non-judicial elective public office. Not Afraid did not forfeit his position and campaigned for the tribal office. Not Afraid advanced after the primary tribal election held on March 28, 2009, but he was not elected Tribal Chairman in the general tribal election held on April 18, 2009. In December 2009, Keller filed a complaint[1] against Not

---

[1] Pursuant to authority granted by Article VII, Section 11(2) of the Montana Constitution and by § 3-1-1105(2), MCA, the JSC adopted Rule 10(b), which provides "[a] complaint shall not be a prerequisite to action by the Commission. The Commission may act on its own motion . . . where the Commission considers it appropriate." In *State ex rel. Smartt v. Jud. Stands. Commn.*, 2002 MT 148, 310 Mont. 295, 50 P.3d 150, we stated in ¶ 30 that "[w]e see nothing in Rule 10(b) that prevents the Commission from carrying out its constitutional duty to investigate complaints from Montana citizens, and nothing in the Montana Constitution that bars the Commission from acting on its own motion to investigate willful misconduct in office, persistent failure to perform judicial duties and violations of the canons of judicial ethics. We conclude

Afraid alleging violations of Article VII, Section 10 as well as Rules 1.1, 1.2, and 3.1 of the 2008 Montana Code of Judicial Conduct.[2]

¶5 Not Afraid sought dismissal of the complaint on the grounds that the JSC lacked jurisdiction; violated his Crow constitutional rights, federal supremacy, Montana law, Crow tribal sovereignty and tribal law; and improperly interpreted "elective public office." Not Afraid argued that the alleged violations of the Code of Judicial Conduct were illusory because of the erroneous application of Article VII, Section 10.

¶6 In March 2010, the JSC denied Not Afraid's motion to dismiss, concluding that Article VII, Section 10 and the Code of Judicial Conduct applies to Not Afraid for his actions as Justice of the Peace, and that the Crow Tribal Chairman position is included within the common definition of an "elective public office." The JSC further determined that the Code of Judicial Conduct would serve as an independent basis for sanctions against Not Afraid which would not be mooted by the completion of the tribal election.

¶7 A hearing on the complaint was held on June 25, 2010. Not Afraid testified about state offices he had resigned upon his election as Justice of the Peace, and about the

---

that the Commission did not exceed its jurisdiction in . . . undertaking its own investigation of the [] allegations."

[2] **Article VII, Section 10** states: "Any holder of a judicial position forfeits that position by either filing for an elective public office other than a judicial position or absenting himself from the state for more than 60 consecutive days."

**Rule 1.1** provides: "*Compliance with the Law* A judge shall comply with the law, including the Code of Judicial Conduct.

**Rule 1.2** states: "*Promoting Confidence in the Judiciary* A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

**Rule 3.1** provides: "*Extrajudicial Activities in General* A judge may engage in extrajudicial activities, except as prohibited by law or this Code. . . ."

counsel he had sought and received regarding the necessity of resigning his Crow legislative seat. He testified that, based upon this advice, it was his belief that he was not required to resign his Crow legislative seat, and that he was also free to pursue election as Crow Chairman while maintaining his state judicial position. After hearing, the JSC concluded that Not Afraid violated Article VII, Section 10, as well as Rules 1.1, 1.2, and 3.1 of the Code of Judicial Conduct. The JSC viewed the advice against resignation which Not Afraid had received as a mitigating factor and recommended to this Court that Not Afraid be publicly reprimanded instead of forfeiting his office, and that he pay the costs of the proceeding.[3] The JSC indicated that a subsequent violation of this nature by Not Afraid would result in its pursuit of Not Afraid's immediate suspension from his judicial position. Not Afraid filed objections to the JSC's recommendations, renewing his argument that the JSC had no legal authority and had erred by denying his motion to dismiss. This Court requested and received a response from Keller to Not Afraid's objections.

## STANDARD OF REVIEW

¶8 We review the Judicial Standard Commission's proceedings *de novo*. *Harris v. Smartt*, 2002 MT 239, ¶ 36, 311 Mont. 507, 57 P.3d 58, *vacated on other grounds*, 2003 MT 135, 316 Mont. 130, 68 P.3d 889. The JSC's recommendations are not binding on this Court. *Harris*, ¶ 36.

---

[3] The JSC's recommendation for the imposition of costs upon Not Afraid is contrary to our holding in *Harris v. Smartt*, 2003 MT 135, ¶ 17, 316 Mont. 130, 68 P.3d 889.

4

**DISCUSSION**

¶9 As a preliminary matter, we address Not Afraid's broadly-stated arguments challenging jurisdiction. Not Afraid argues that the "imposition of Article VII, Section 10 of the Montana Constitution upon [him] constituted a violation of and interference with the Crow Constitution[] and Crow sovereignty . . . ." First, though not specifically raised by Not Afraid, it is clear that Not Afraid cannot raise the defense of sovereign immunity. Indian tribes, and tribal officials acting in their official tribal capacity, have sovereign immunity from suit in state courts unless Congress authorized the suit or the tribe has unequivocally waived its immunity. *Thompson v. Crow Tribe of Indians*, 1998 MT 161, ¶¶ 15, 17, 23, 289 Mont. 358, 962 P.2d 577. However, individual tribal members can be sued for personally violating state law, regardless of whether the tribe itself is determined to be immune from suit. *Puyallup Tribe, Inc. v. Dept. of Game of Wash.*, 433 U.S. 165, 171-72, 97 S. Ct. 2616, 2621 (1977). Not Afraid has been subjected to this proceeding for his individual acts, so he cannot personally raise the defense of sovereign immunity.

¶10 Subject matter jurisdiction pertains to the fundamental power of a court to hear and decide a case. *Pinnow v. Mont. St. Fund*, 2007 MT 332, ¶ 16, 340 Mont. 217, 172 P.3d 1273. The issue of subject matter jurisdiction can be raised at any time. *Wippert v. Blackfeet Tribe of the Blackfeet Indian Reservation*, 260 Mont. 93, 102, 859 P.2d 420, 425 (1993). While state and tribal jurisdiction is complex, certain principles have consistently been recognized. "Essentially, absent governing Acts of Congress, the

5

question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 79 S. Ct. 269, 271 (1959). Additionally, "[t]he cases in this Court have consistently guarded the authority of Indian governments over their reservations." *Williams*, 358 U.S. at 223, 79 S. Ct. at 272. The jurisdictional tests employed by this Court have recognized these foundational principles. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S. Ct. 2578, 2583 (1980) (quoting *Williams* for the second prong of its test); *First v. State Dept. of Soc. & Rehab. Servs.*, 247 Mont. 465, 471, 808 P.2d 467, 470 (1991) (adopting the *White Mountain Apache* test in Montana); *State ex rel. Iron Bear v. Dist. Ct.*, 162 Mont. 335, 339-40, 346, 512 P.2d 1292, 1295-96, 1299 (1973) (adopting a three-part test based, in part, on *Williams*); *see also In re Marriage of Skillen*, 1998 MT 43, ¶¶ 42-47, 287 Mont. 399, 956 P.2d 1 (differentiating between and clarifying the *White Mountain Apache* and *Iron Bear* tests). This Court has recognized tribal sovereignty and the right of tribal self-government. *See Skillen*, ¶ 41 (citing *In re Custody of Zier*, 230 Mont. 464, 750 P.2d 1083 (1988); *In re Marriage of Limpy*, 195 Mont. 314, 636 P.2d 266 (1981); *State ex rel. Stewart v. Dist. Ct.*, 187 Mont. 209, 609 P.2d 290 (1980)).

¶11 We have also acknowledged that, generally, " '[t]he exercise of state jurisdiction over activities occurring entirely on Indian lands is an infringement on inherent tribal authority and is contrary to principles of self-government and tribal sovereignty.' " *Matter of Hanna*, 2010 MT 38, ¶ 17, 355 Mont. 236, 227 P.3d 596 (quoting *Flat Ctr. Farms, Inc. v. State Dept. of Revenue*, 2002 MT 140, ¶ 13, 310 Mont. 206, 49 P.3d 578).

6

However, when substantial activities occur off the reservation, the state may generally assume jurisdiction. *Matter of Bertelson*, 189 Mont. 524, 531, 617 P.2d 121, 125 (1980) (citations omitted); *see also Little Horn State Bank v. Stops*, 170 Mont. 510, 517, 555 P.2d 211, 214 (1976); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49, 93 S. Ct. 1267, 1270 (1973) (citations omitted). Montana courts have jurisdiction over a tribal member whose actions involve " 'significant contacts with the state outside reservation boundaries.' " *Balyeat Law, PC v. Pettit*, 1998 MT 252, ¶ 38, 291 Mont. 196, 967 P.2d 398 (quoting *Crawford v. Roy*, 176 Mont. 227, 230, 577 P.2d 392, 393 (1978)).

¶12 We disagree with Not Afraid's contention that the JSC is attempting to regulate "Indian[s] running for tribal office." The state has made no effort to regulate candidates for tribal office. The Crow Tribe may qualify its own candidates and conduct its own elections. Here, the state is seeking to enforce the qualifications for a state office which was sought and obtained by an individual Crow tribal member. Not Afraid's actions, in filing and running for state office, involved much more than "significant contacts with the state." He became a state official and took a constitutional oath of office to support, protect, and defend the Montana Constitution. Therefore, the state is not impermissibly interfering with tribal sovereignty or self-governance, and has jurisdiction to pursue the complaint against Not Afraid.

¶13 *Is the office of Crow Tribal Chairman an "elective public office" for purposes of Article VII, Section 10?*

7

¶14 Article VII, Section 10 of the Montana Constitution states that "[a]ny holder of a judicial position forfeits that position by either filing for an *elective public office* other than a judicial position or absenting himself from the state for more than 60 consecutive days." (Emphasis added.) Not Afraid argues that the definition of "elective public office" in the constitution and in statute does not include elective tribal offices, and thus he did not violate the provision by filing as a candidate for tribal office. He argues that Keller failed to establish that a "public" office includes an office filled by qualified tribal members voting in an election on their own reservation. Evidence introduced at the hearing indicated that the number of votes cast in the Crow Chairman primary election was about 3,500, and the number of votes cast in the Crow Chairman general election was approximately 3,400. Keller responds that "elective public office" includes the Crow chairmanship because the position is defined as an executive office in the Crow Constitution, is elected by a public vote of eligible voters, and foreign authority has held that tribal council members are "elected public officials."

¶15 "The same rules of construction apply in determining the meaning of constitutional provisions as apply to statutory [con]struction." *Keller v. Smith*, 170 Mont. 399, 404, 553 P.2d 1002, 1006 (1976) (citations omitted). "In determining the meaning of a given provision, the intent of the framers is controlling." *Keller*, 170 Mont. at 405, 553 P.2d at 1006 (citations omitted). "Such intent shall first be determined from the plain meaning of the words used, if possible, and if the intent can be so determined, the courts may not go further and apply any other means of interpretation." *Keller*, 170 Mont. at

8

405, 553 P.2d at 1006 (citations omitted). If the language itself is not clear, "we must resort to extrinsic rules of construction." *Keller*, 170 Mont. at 406, 553 P.2d at 1007.

¶16    Using this framework as a guide, we first look at the words of the constitution. Constitutional language should be given its natural or ordinary meaning. *Gen. Agric. Corp. v. Moore*, 166 Mont. 510, 516, 534 P.2d 859, 863 (1975) (citations omitted). However, the language of Article VII, Section 10 does not indicate whether the term "public office" includes only offices of the state or would include the offices of another sovereign. The provision does not reference tribal offices. It provides no guidance regarding what constitutes a "public" office, as opposed to an office elected by a group whose membership is narrower than the general public.

¶17    "The rule is that when the framers' intent cannot be determined from the Constitution's plain words, recourse may be had to the proceedings of the Constitutional Convention." *State ex rel. Racicot v. Dist. Ct.*, 243 Mont. 379, 386-87, 794 P.2d 1180, 1184 (1990) (citation omitted). Unfortunately, our constitutional history offers little help in discerning the intent of this provision. The explanatory notes of the 1972 Constitutional Convention regarding Article VII, Section 10 state, in their entirety: "New provision. A judge may not run for any other public office, or be out of the state for more than 60 days." The Convention transcripts include comments by the delegates that this provision would prohibit a judge from "filing for *any* other office during his term of office." Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, p. 1120 (emphasis added). The purpose was "to prevent what we think is political

9

ambition" and prevent "using the courts as stepping-stones in fulfillment of a political ambition," and the tone of the discussion revealed an understanding that "any office" meant any "political office." Montana Constitutional Convention, Verbatim Transcript, February 29, 1972, p. 1120. Again, there is no particular guidance with regard to the application of the provision to tribal offices.

¶18 We may also consult the Legislature's determination of constitutional intent. "While such determination is not binding on this Court, it is entitled to consideration." *Keller*, 170 Mont. at 407, 553 P.2d at 1007. The Attorney General has opined that §§ 3-1-607 and 3-1-608, MCA, are implementing statutes for Article VII, Section 10. Mont. Atty. Gen. Op. 21, 44 Op. Atty. Gen. Mont. 21 at *4 (Oct. 22, 1991).[4] Section 3-1-607(1), MCA states:

> **Supreme court justice or district court judge candidacy for nonjudicial office--resignation required.** (1) If a person occupying the office of chief justice or associate justice of the supreme court or judge of a district court of the state of Montana becomes a candidate for election to any elective office under the laws of the state of Montana other than a judicial position, the person shall immediately, or in any event at or before the time when the person is required to file as a candidate for the office in any primary, special, or general election, resign from the office of chief justice, associate justice, or district court judge.

This provision requires a judge to resign from his office upon becoming "a candidate for election to any elective office *under the laws of the state of Montana . . . .*" Section 3-1-607(1), MCA (emphasis added). This language applies the prohibition to only those offices governed by state law and thus excludes tribal offices, which are created and

---

[4] It is not necessary to address, and we take no position on, the opinions expressed within the referenced Attorney General's opinion, which focused on a different issue. We simply review the statutes for the broader purpose of gleaning constitutional intent.

governed by tribal law. Keller correctly notes that this provision does not include justices of the peace, addressing only district court judges and supreme court justices. We acknowledged the same in regard to the predecessor version of the statute in *Committee for an Effective Judiciary v. State*, 209 Mont. 105, 679 P.2d 1223 (1984), noting that the statute "prevent[s] only district judges and supreme court justices from seeking other judicial office without forfeiting their office." *Comm. for an Effective Jud.*, 209 Mont. at 113, 679 P.2d at 1227. However, we also explained that the prohibition as stated in Article VII, Section 10 is broader than the statute in this regard, as it "applies to all judges in this state." *Comm. for an Effective Jud.*, 209 Mont. at 113, 679 P.2d at 1227.[5] Thus, the Constitution reaches justices of the peace though the statute does not. We look to the statute here only for its guidance on the meaning of "public office."

¶19 Not Afraid notes that tribal offices are not mentioned with the other offices included within the definition of "public office" provided by the election statutes, and he urges that we make the same distinction. Section 13-1-101(28), MCA, provides that " '[p]ublic office' means a state, county, municipal, school, or other district office that is filled by the people at an election," and tribal offices are notably missing from this listing. There is also legislative history regarding the election statutes which supports Not Afraid's position. In 2003, the Legislature considered a bill to generally revise the election code. The sponsor proposed an amendment which was eventually adopted and is

---

[5] The Court in *Committee for an Effective Judiciary* declared the predecessor versions of §§ 3-1-607 and 608, MCA, to be unconstitutional. *Comm. for an Effective Jud.*, 209 Mont. at 115, 679 P.2d at 1229. The Legislature subsequently amended § 3-1-607, MCA, to comply with the decision.

currently codified at § 13-10-201(1), MCA: "A candidate may not file for more than one public office. . . ." During the discussion of this provision, Rep. Windy Boy asked the sponsor if he, as a tribal member, would be affected by the rule against running for two positions simultaneously. Mont. H. State Admin. Comm., *Minutes of the Hearing on H. Bill 190*, 58th Legis., Reg. Sess. 3 (Jan. 29, 2003). Rep. Windy Boy was also a Chippewa-Cree Tribal Councilman. In response, the sponsor stated that the proposed statute would not affect Rep. Windy Boy because "tribal government is sovereign." Mont. H. State Admin. Comm., *Minutes of the Hearing on H. Bill 190,* at 3.

¶20 Keller argues that this definition of "public office" should be restricted to Title 13 of the MCA and not applied to issues arising under the Montana Constitution or the Code of Judicial Conduct. He notes that § 13-1-101, MCA, states "[a]s used in this title, unless the context clearly indicates otherwise, the following definitions apply. . . ." We have held, however, that "when a word is defined in the code, that definition is applicable to other parts of the code except where the contrary is plainly indicated." *SJL of Mont. Assocs. Ltd. Partn. v. City of Billings*, 263 Mont. 142, 147, 867 P.2d 1084, 1087 (1993) (citing § 1-2-107, MCA; *Dept. of Revenue v. Gallatin Outpatient Clinic*, 234 Mont. 425, 430, 763 P.2d 1128, 1131 (1988)). We see no clear indication that the statutory definition of "public office" cannot be referenced for issues arising outside of Title 13.

¶21 This Court has previously addressed the issue of what constitutes a "public office." We have noted that " '[t]he American concept of a public office is that of a public trust or agency created for the benefit of the people, and in which the incumbent

12

has not a property right, to be administered under legislative control in the interest of the people.' " *State ex rel. Hollibaugh v. State Fish & Game Commn.*, 139 Mont. 384, 390, 365 P.2d 942, 946 (1961) (quoting *State ex rel. Nagle v. Sullivan*, 98 Mont. 425, 437, 40 P.2d 995, 997-98 (1935)). In *Forty-Second Legislative Assembly v. Lennon*, 156 Mont. 416, 481 P.2d 330 (1971), we were called upon to determine whether delegates to the constitutional convention were " 'state officer[s]' holding a public office of a civil nature" for purposes of the constitutional prohibition on holding more than one office. In doing so, we articulated the following standards for resolving the question:

> After an exhaustive examination of the authorities, we hold that five elements are indispensable in any position of public employment, in order to make it a public office of a civil nature: (1) It must be created by the Constitution or by the legislature or created by a municipality or other body through authority conferred by the Legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the Legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power, other than the law, unless they may be those of an inferior or subordinate office, created or authorized by the legislature, and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity and not be only temporary or occasional.

*Forty-Second Legis. Assembly*, 156 Mont. at 422-23, 481 P.2d at 333-34 (quoting *State ex rel. Barney v. Hawkins*, 79 Mont. 506, 528-29, 257 P. 411, 418 (1927)). We have explained that if any one of the five elements is missing, then the particular position is considered employment, and not a public office. *State ex rel. Running v. Jacobson*, 140 Mont. 221, 225, 370 P.2d 483, 485 (1962).

13

¶22 Applying the above test, the position of Crow Tribal Chairman is not created by the Montana Constitution nor by the Legislature, so element (1) is not satisfied. The powers and duties of Crow Tribal Chairman are not directly or impliedly defined by the Montana Legislature, thereby negating element (3). At least two elements would not be satisfied. While this test may not have been designed for the particular issue before us, it nonetheless provides guidance with regard to the factors we have considered to be significant in deciding the contours of a "public office."

¶23 Keller's argument emphasizes the following language from *Committee for an Effective Judiciary*:

> The judicial article is clearly the most restrictive—it imposes severe sanctions on office-seeking by judicial office holders. Any judge holding office in this state forfeits his office if he files for any office—"other than a judicial position." (Art. VII, Section 10, supra.)

*Comm. for an Effective Jud.*, 209 Mont. at 115, 679 P.2d at 1228. This language is concededly broad, indicating that a judge who files for "any office" forfeits his judicial position. It could be considered dictum, given that the issue in that case was the Legislature's prohibition on judges filing for other *judicial* offices. Perhaps more important, for the purposes of this case, is the incongruity between this statement and the language of Article VII, Section 10. The constitutional prohibition extends, not to "any office," but to an "elective public office," and the opinion in *Committee for an Effective Judiciary* provided no analysis of this phrase. Rather, it focused on the phrase "other than a judicial position" within Article VII, Section 10: "The language, 'other than a judicial position,' shows that the delegates intentionally left the door open for judicial

14

office holders to file for other judicial office without forfeiting their offices as a condition to seeking other judicial office through the election process." *Comm. for an Effective Jud.*, 209 Mont. at 115, 679 P.2d at 1228. Thus, we do not believe the language quoted above from *Committee for an Effective Judiciary* determines the issue before us today—whether "elective public office" includes tribal offices.

¶24 Keller also offers *Confederated Tribes of the Siletz Indians of Oregon v. Employment Department*, 995 P.2d 580 (Or. App. 2000), which, in part, determined whether Siletz Indian tribal council members were "elected public officials" under Oregon statutes. In *Confederated Tribes*, an unemployment compensation dispute arose when three members of the Siletz tribal council were removed from office and claimed unemployment benefits. *Confederated Tribes*, 995 P.2d at 582. The Siletz tribe had previously elected to be subject to Oregon's employment statutes. *Confederated Tribes*, 995 P.2d at 582. The Tribe argued the former tribal council members should be considered "elected public officials," under a statute, rendering them ineligible for unemployment coverage. *Confederated Tribes*, 995 P.2d at 584-85. After analyzing the statutory text, statutory context, and legislative history, the court concluded that the language excluding coverage for elected public officials was intended only to apply to state and local government employees—not to any other category of elected public officials such as tribal officials—and awarded unemployment benefits to the former council members. *Confederated Tribes*, 995 P.2d at 585-89. Keller argues that "authority exists" to conclude the Crow chairmanship is an elective public office, relying

15

on the Oregon Court's comment that, under a dictionary definition, "the ordinary meaning of the term 'elected public official' would appear to include Siletz's tribal council members." *Confederated Tribes*, 995 P.2d at 585. However, the holding in the Oregon case was actually the opposite. Consequently, we do not find *Confederated Tribes* persuasive.

¶25 We acknowledge there is little authority to assist in deciding this question. However, it is clear that nothing within the constitutional language, the delegates' statements, statutory provisions, legislative history or case precedent reveals any indication to include tribal offices within the concept of "elective public office" under Montana law. All indications point to the opposite conclusion—that tribal offices are creations of another sovereign and not considered public offices of the state. Here, the office of the Crow chairmanship was created by the Crow Tribe and only tribal members are eligible to run for or to vote for the position. Members of the Montana public at large are not.

¶26 Therefore, we conclude that the phrase "elective public office" in Article VII, Section 10, of the Montana Constitution does not include the tribal office of Crow Tribal Chairman. Consequently, Not Afraid did not violate this provision by becoming a candidate for election as Crow Tribal Chairman. Because Not Afraid was not in violation of Article VII, Section 10, we also conclude that he was not in violation of Rules 1.1, 1.2, or 3.1 of the Montana Code of Judicial Conduct. We further order that each party is responsible for its own legal costs and fees.

¶27 The complaint against Not Afraid is dismissed.

DATED this 30th day of December, 2010.

/S/ JIM RICE

We concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS

Justice James C. Nelson, concurring in the result but dissenting from the reasoning.

¶28 I agree with the Court that the complaint against Not Afraid must be dismissed, but I strongly disagree with the Court's rationale.

## I. Jurisdiction

¶29 The most fundamental problem with this case is evident from its caption: *Inquiry Concerning Complaint of: Judicial Standards Commission v. Leroy Not Afraid.* While the Court correctly observes that questions of jurisdiction may be raised at any time, Opinion, ¶ 10—indeed, courts have an "independent obligation" to determine whether jurisdiction exists, even in the absence of a challenge from any party, *see Stanley v. Lemire*, 2006 MT 304, ¶¶ 30-32, 334 Mont. 489, 148 P.3d 643—and while the Court then addresses the question of whether the Judicial Standards Commission (JSC) is interfering

with tribal sovereignty or self-governance, Opinion, ¶¶ 11-12, the Court inexplicably ignores the threshold question of whether the JSC has authority to file complaints against judicial officers on its own motion. The Court does not address this important issue directly but, rather, in a footnote containing no analysis, cites a JSC rule and a prior decision of this Court as support for the JSC's action. Opinion, ¶ 4 n. 1. Neither of these, however, is valid authority for the JSC to proceed as it has in this matter; and, in fact, I conclude that the JSC does not have such authority.

¶30 The JSC is established by the Montana Constitution, and its power and authority are delineated by the Constitution. In particular, "[t]he commission shall investigate *complaints*, and make rules implementing this section. It may subpoena witnesses and documents." Mont. Const. art. VII, § 11(2) (emphasis added). Significantly, this provision does not grant the JSC authority to commence investigations into any matter it deems interesting or worrisome. It says, rather, that the JSC shall investigate "complaints." The implication of this language is that the JSC does not act on its own motion but, rather, acts only pursuant to a "complaint" brought by someone *other than the JSC itself*.

¶31 This interpretation is supported by the statutes implementing Article VII, Section 11. Section 3-1-1106(1)(a), MCA, states:

> The commission, upon the filing of a written complaint *by any citizen of the state*, may initiate an investigation of any judicial officer in the state to determine if there are grounds for conducting additional proceedings before the commission. If the commission's investigation indicates that additional proceedings before the commission may be justified, the commission shall require *the citizen who filed the original*

18

*written complaint* to sign *a verified written complaint* before conducting additional proceedings. [Emphases added.]

Likewise, subsection (1)(b) states:

> The commission shall give the judicial officer written notice of *the citizen's complaint* and of the initiation of an investigation. Notice must also be given if *a verified written complaint* is filed and must include the charges made, the grounds for the charges, and a statement that the judicial officer may file an answer. The notice must be signed by the commission. [Emphases added.]

Also, § 3-1-1126(1)(a), MCA, directs the JSC, in its reports to the Legislature, to identify "each complaint, whether or not verified, *received* by the commission" (emphasis added).

There is no suggestion that complaints may be filed by the JSC itself. To the contrary, these provisions recognize only complaints filed by *citizens*.

¶32 This interpretation of Article VII, Section 11(2) is also supported by the comments of the 1972 Constitutional Convention delegates. Delegate Aronow observed that

> this article provides for three district judges, one lawyer and one layman, a committee of five, to investigate and look into any complaints that are made or any information that comes to the attention of the commission that a judge, either because of old age, other disability, is not attending to duties properly and provide for his retirement or removal from office.

Montana Constitutional Convention, Verbatim Transcript, Feb. 29, 1972, p. 1123.[1]

Delegate Aronow further explained that

> we've never had a commission of this type to which a practicing lawyer could go. The only way that you can get rid of a judge was through impeachment or wait until the next election and try to get somebody to run against him. *This is a procedure where a letter can be written or a charge filed with this commission and ask them to look into it, investigate it,* and, if

---

[1] The composition of the JSC was later amended to be *two* district judges, one attorney, and *two* laypersons. *See id.* at 1126.

the facts were found to be true, then to take such action as [they] might deem appropriate.

*Id.* at 1126 (emphasis added).

¶33 Likewise, Delegate Berg noted that

[w]e are particularly interested in seeing to it that District judges and Supreme Court justices have some protection, not only of themselves in the case of senility or alcoholism, but frequently charges are made against judges which, of course, they are almost powerless to answer. If there is a commission before whom those charges can be filed, the judge has an opportunity to defend himself.

*Id.* at 1125.

¶34 The delegates contemplated that the JSC's proceedings would be at the behest of an aggrieved citizen. Indeed, it is notable that the delegates adopted the current language of Article VII, Section 11(2)—which, as noted, grants the JSC authority to "investigate complaints"—over language that would have granted the JSC "the power to investigate . . . upon complaint by any citizen *or on its own motion*." *See id.* at 1122 (emphasis added). Section 3-1-1106(1), MCA, correspondingly, refers to a complaint filed by a *citizen*, not by the JSC *on its own motion*.

¶35 In the present case, however, the official record filed with the Clerk of the Supreme Court in Case No. PR 09-0639 does not contain a written complaint by a citizen—let alone a *verified* written complaint by a citizen. Rather, the so-called "Formal Complaint" upon which this action is premised was filed by the JSC itself. To be sure, it was signed by an individual (Geoffrey R. Keller). But Keller signed in his capacity as "Prosecuting Attorney," and the first paragraph of the complaint states that Keller was

20

"appointed by the Judicial Standards Commission" and is proceeding "on behalf of" the "Judicial Standards Commission," which is the named "Complainant." In other words, the JSC hired Keller as prosecutor and then directed him to file, in the JSC's name, the complaint against Not Afraid, which the JSC then heard and decided.[2]

¶36 While not a matter of record, it appears that the JSC's action was prompted by an unverified letter from the Commission on Courts of Limited Jurisdiction (COCLJ) dated May 5, 2009 and addressed to the Chief Justice and myself, with copies to Not Afraid and the JSC. This letter was intended to "notify[ ]" this Court and the JSC of "an issue that may result in the disqualification of a sitting Justice of the Peace."[3] It is doubtful that this letter qualifies as a *citizen* complaint filed with the JSC. But assuming, for the sake of argument, that it is, § 3-1-1106, MCA, required the JSC to follow these steps:

1. Upon the filing of the written complaint, initiate an investigation to determine if there are grounds for conducting additional proceedings.

2. If the investigation indicates that additional proceedings may be justified, then "require the citizen who filed the original written complaint to sign a verified written complaint before conducting additional proceedings."

3. After an investigation, and upon a finding of good cause, do any of the following: (a) order a hearing to be held before the JSC concerning the censure, suspension, removal, or retirement of the judicial officer; (b) confidentially advise the judicial officer and this Court that the complaint will be dismissed if the judicial officer files a letter stating that he or she will take corrective action satisfactory to the JSC; or (c) request that this Court appoint one or more special masters to hear and take evidence and to report to the JSC.

---

[2] I believe the JSC also compensated Keller for his time and trouble on behalf of his client, the JSC.

[3] It is unfortunate that this Court, itself, did not intervene in this matter at this point. Clearly, we could have and should have under our power of supervisory control, Mont. Const. art. VII, § 2(2). *See* ¶ 48 n. 4, *infra*.

21

4.  If after a hearing or after considering the record and the report of the masters the JSC finds the charges true, then recommend to this Court the censure, suspension, removal, or disability retirement of the judicial officer.

¶37   Again, assuming the COCLJ letter constituted a citizen complaint, the JSC was permitted to initiate an investigation to determine whether grounds existed to conduct additional proceedings.  If such grounds existed, the JSC was required to obtain a verified written complaint before conducting the additional proceedings.  According to the record filed in this case, however, that procedure was not followed.  There is no verified written complaint by a citizen.  Rather, the JSC proceeded based solely on its own complaint against Not Afraid.  The JSC held a hearing on the complaint in June 2010 (step 3(a) above) and filed a recommendation with this Court in August 2010 (step 4) that Not Afraid receive a public reprimand.  Basically, everything the JSC did after receiving the letter and completing a preliminary investigation (step 1) was unlawful.

¶38   There is no authority for the JSC to charge, hear, and then adjudicate the merits of its own complaint.  That approach is contrary to the intent of Article VII, Section 11(2) and the dictates of § 3-1-1106, MCA.  The JSC in this case has plainly overstepped its authority.  Moreover, I note that this procedure—under which the JSC has anointed itself complainant, investigator, and adjudicator—raises the same concerns which prompted this Court to enact structural changes to the Commission on Practice.  *See Goldstein v. Commn. on Practice of the Supreme Court*, 2000 MT 8, 297 Mont. 493, 995 P.2d 923; *In re Creation of Office of Discipline Counsel*, 2001 MT 257, 307 Mont. 210, 53 P.3d 861.  These structural changes included separating the investigative authority, the reviewing

22

authority, the charging authority, and the adjudicatory authority so that all four are not conducted by the same individuals. But here, in contrast, all four of these functions were conducted by the same members of the JSC. Surely judges who are subject to discipline are entitled to the same due process rights as those enjoyed by attorneys who are subject to discipline. As perhaps the most basic component of due process, Not Afraid had the right to be judged by an impartial tribunal, not by the very body that filed the charges against him. *See Goldstein*, ¶ 64 (Nelson, Leaphart, & Trieweiler, JJ., dissenting). As James Madison observed, "No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity. With equal, nay with greater reason, a body of men are unfit to be both judges and parties at the same time . . . ." *The Federalist No. 10*, at 79 (C. Rossiter ed. 1961).

¶39 The Court does not deny that the constitutional and statutory requisites for the JSC's proceedings were not met in this case. Rather, in a footnote, the Court merely cites to the JSC's Rule 10(b) and our decision in *State ex rel. Smartt v. Jud. Stands. Commn.*, 2002 MT 148, ¶ 30, 310 Mont. 295, 50 P.3d 150, as support for the JSC's action here. Opinion, ¶ 4 n. 1. Yet, as stated at the outset, neither of these is valid authority for the JSC to initiate formal proceedings on its own complaint.

¶40 First, *Smartt* is distinguishable on its facts in that the proceedings there were initiated at the behest of a citizen (Samuel Harris) who filed first an unverified complaint, and later a verified complaint, against Smartt with the JSC. *See Smartt*, ¶¶ 5, 21. Notably, the JSC conceded that the First Judicial District Court "was correct to enjoin the

23

Commission from instituting formal proceedings [against Smartt] before it had obtained a verified complaint [from Harris]." *Smartt*, ¶ 15.

¶41 Furthermore, the question under consideration in ¶ 30 of *Smartt* was whether the JSC had overstepped its authority by investigating allegations which had come to the JSC's attention in the course of investigating Harris's complaint and which had been leveled by a different individual who had not filed a complaint with the JSC. *See Smartt*, ¶¶ 5, 22. We stated that the JSC may act on its own motion, and in the absence of a verified complaint, to investigate alleged judicial misconduct based upon information otherwise received. *Smartt*, ¶¶ 29-30. Yet, although I signed our opinion in *Smartt*, upon further research I cannot agree with the proposition that the JSC may file charges against a judge or justice on its own motion and then sit in judgment of its own case. That is not what the delegates had in mind; indeed, as noted, they declined to adopt language that would have granted the JSC "the power to investigate . . . on its own motion." Also, it is not what the applicable statutes say.

¶42 In this regard, this Court has held that the JSC may not adopt rules which conflict with the statutory provisions implementing Article VII, Section 11. *State ex rel. Shea v. Jud. Stands. Commn.*, 198 Mont. 15, 30-34, 643 P.2d 210, 218-20 (1982). At issue in *Shea* were charges against then-Justice Shea arising out of (1) an unverified letter from a retired district judge alleging that automobiles registered in the name of Justice Shea's wife had accumulated 60 unpaid parking tickets and (2) an unverified complaint by the JSC itself that Justice Shea had used "intemperate" language in a dissenting opinion. *See*

*id.* at 19-20, 30-32, 643 P.2d at 212-13, 218-19. As authority for proceeding without a verified complaint, the JSC had relied on its Rule 9(b), which stated: "The commission, without receiving a verified statement, may make such a preliminary investigation on its own motion." *Id.* at 24, 643 P.2d at 215. We held this rule invalid, however, because it conflicted with the statutory requirement (under § 3-1-1106(1), MCA) that the JSC's investigations be conducted pursuant to a "verified written complaint." *Id.* at 31, 643 P.2d at 219. We observed that the JSC, in proceeding under Rule 9(b), was

> assuming unto itself the right to ignore legislatively enacted provisions governing its procedure, and even its own rule requiring a verified complaint, in its perception and under the assumption that it is now acting and will act for the public good. The question, however, is not one of motives but of constitutional authority, for which the best of motives is not a substitute.

*Id.* at 32, 643 P.2d at 219. We concluded that the JSC was powerless to set aside the statutory requirement that it proceed against judicial officers only by verified written complaint—Rule 9(b) and the JSC's rulemaking authority notwithstanding. *Id.* at 34, 643 P.2d at 220.

¶43 It should be noted here that at the time we decided *Shea*, § 3-1-1106(1), MCA, contemplated that the JSC could initiate an investigation by filing its own verified written complaint. The statute provided: "*The commission* or any citizen of the state may, upon good cause shown, initiate an investigation of any judicial officer in the state by filing a verified written complaint with the commission." Section 3-1-1106(1), MCA (1981) (emphasis added). But in 1983, the Legislature revoked that authority, requiring instead that a complaint be filed by a citizen. The revised statute provided (and still provides):

25

The commission, upon the filing of a written complaint *by any citizen of the state*, may initiate an investigation of any judicial officer in the state to determine if there are grounds for conducting additional proceedings before the commission. If the commission's investigation indicates that additional proceedings before the commission may be justified, the commission shall require *the citizen who filed the original written complaint* to sign *a verified written complaint* before conducting additional proceedings.

Section 3-1-1106(1)(a), MCA (1983 & 2009) (emphases added). This is further evidence that the JSC has no authority to commence proceedings against a judge or justice on its own complaint.

¶44 This Court was unanimous in *Shea* with respect to Issue 3, where the Court held that a verified written complaint is a requisite for JSC proceedings, despite the JSC's attempt through Rule 9(b) to expand its authority to conduct investigations in the absence of such a complaint. Justice Sheehy authored the opinion of the Court, in which Justices Daly and Morrison concurred; and Justice Weber, through a special concurrence, provided the essential fourth vote as to Issue 3. *See Shea*, 198 Mont. at 40, 643 P.2d at 224 (Weber, J., specially concurring). Significantly, however, Justice Weber did *not* join Justice Sheehy's opinion as to Issue 4, thus making that part of the decision a plurality. Under Issue 4, Justice Sheehy considered whether the charges made against Justice Shea, relating to unpaid parking tickets and "intemperate" language in a dissenting opinion, constituted "willful misconduct in office." *See id.* at 34-39, 643 P.2d at 220-23 (plurality opinion). He concluded that they did not amount to "willful misconduct in office" and that the JSC, therefore, had acted "in excess of its jurisdiction" by pursuing these charges. *Id.* at 39, 643 P.2d at 223. Justice Weber, however, noted that it was unnecessary to

26

reach Issue 4 given the threshold determination under Issue 3 that the proceedings against Justice Shea were barred due to the lack of a verified complaint. *See id.* at 40-41, 643 P.2d at 224 (special concurrence).

¶45 The significance of Justice Weber's vote was overlooked by the Court in *Smartt*. We asserted that the *Shea* Court "did not issue the writ of prohibition solely because the Commission proceeded against Justice Shea without the statutorily required verified complaint, but, rather, primarily because the Commission exceeded its jurisdiction in investigating a charge that did not amount to 'misconduct in office.' " *Smartt*, ¶ 17. This is a complete misstatement of the *Shea* decision. The fact is that the writ of prohibition did issue *solely* because the JSC proceeded against Justice Shea without the statutorily required verified complaint. That was the one—and only—ground that commanded a majority of the Court. Only a plurality reached the conclusion that the JSC had also exceeded its jurisdiction by investigating charges that did not amount to "misconduct in office," and the entire discussion under Issue 4 of *Shea* was, therefore, dicta.

¶46 For the foregoing reasons, the suggestions in *Smartt* that the JSC may initiate an investigation and file charges on its own motion and that we did not squarely hold to the contrary in *Shea* are simply wrong and should be overruled.

¶47 As a final matter, the Court notes that the JSC adopted Rule 10(b) pursuant to authority granted by Article VII, Section 11(2) and § 3-1-1105(2), MCA. The former authorizes the JSC to "investigate complaints, and make rules implementing this section," while the latter states that the JSC "shall make rules for the conduct of its affairs and the

enforcement of confidentiality consistent with this part." Yet, the authority to make rules is not also authority for the JSC to delineate or expand its own jurisdiction. In this regard, it should not be forgotten that jurisdiction is conferred "only by the Constitution or statutes adopted pursuant to the Constitution" and that administrative rules are not a source of jurisdiction. *Pinnow v. Mont. State Fund*, 2007 MT 332, ¶¶ 20-23, 340 Mont. 217, 172 P.3d 1273. Furthermore, for the reasons just discussed, the JSC may not, through its rulemaking authority, ignore legislatively enacted provisions setting forth the requisites for JSC proceedings. *Shea*, 198 Mont. at 32-34, 643 P.2d at 219-20. Those provisions require that JSC proceedings be founded upon the verified written complaint of a citizen. Any statutory authority the JSC may have had to proceed on its own motion—assuming such authority was valid in the first place—was revoked in 1983 with the amendments to § 3-1-1106, MCA. Regardless of how much power and authority the JSC has purported to confer unto itself under Rule 10(b), the JSC's jurisdiction is constrained by the Constitution and statutes adopted pursuant to the Constitution, and those provisions authorize the JSC to act only upon citizen complaints.

¶48 Accordingly, the JSC's action here is legally unfounded, and I cannot agree with the Court's ratification of it. The JSC has no authority to charge, hear, and adjudicate the merits of its own complaint. The JSC may proceed against a judicial officer only by the

28

verified written complaint of a citizen. I thus would hold that the JSC had no jurisdiction over this action, and I would dismiss the JSC's complaint on this basis.[4]

## II. "Elective Public Office"

¶49 Because the Court has proceeded to analyze the merits of the JSC's complaint against Not Afraid, I will explain my disagreement with the Court's analysis.

¶50 First, the Court's entire discussion commencing at ¶ 17 and concluding at ¶ 26 is premised on the notion that Article VII, Section 10 is ambiguous. (As the Court concedes, if a provision is unambiguous, we simply apply the provision according to the plain meaning of its words and do not resort to extrinsic sources as the Court does here. Opinion, ¶ 15; *see also State v. Turbiville*, 2003 MT 340, ¶ 21, 318 Mont. 451, 81 P.3d 475.) The Court's premise, however, is wrong.

¶51 Article VII, Section 10 states: "Any holder of a judicial position forfeits that position by either filing for an elective public office other than a judicial position or absenting himself from the state for more than 60 consecutive days." The term at issue is "elective public office." These words have a plain and unambiguous meaning.

¶52 A "public office" is "[a] position whose occupant has legal authority to exercise a government's sovereign powers for a fixed period." *Black's Law Dictionary* 1351 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009). This, in substance, is the same

---

[4] This is not to say that cases like this will go unaddressed if no complaint is filed with the JSC. Constitutionally, this Court has "general supervisory control over all other courts" in this state. Mont. Const. art. VII, § 2(2). In cases where the JSC is without authority to act, as here, this Court has the constitutional power and obligation to act sua sponte and to take appropriate action as the Constitution, law, and circumstances require.

definition of "public office" that existed when Article VII, Section 10 was adopted. *See Black's Law Dictionary* 1235 (rev. 4th ed., West 1968) ("The right, authority, and duty created and conferred by law, by which for a given period . . . an individual is invested with some portion of the sovereign functions of government for the benefit of the public."). Likewise, this Court has recognized that "the creation and conferring of an office involves a delegation to the individual of some of the sovereign functions of government, to be exercised by him for the benefit of the public." *State ex rel. Running v. Jacobson*, 140 Mont. 221, 225, 370 P.2d 483, 485 (1962) (internal quotation marks omitted); *see also State ex rel. Barney v. Hawkins*, 79 Mont. 506, 515-29, 257 P. 411, 413-18 (1927) (explaining that "public office" involves the exercise of some portion of the sovereign power of the government). Thus, we have held that neither a law clerk nor a district court master is a "public officer" because those individuals do not exercise "sovereign power" or "sovereign judicial authority." *State ex rel. Paugh v. Bradley*, 231 Mont. 46, 52, 753 P.2d 857, 861 (1988). Even the test cited by the Court at ¶ 21 recognizes that a "public office" is a position that involves the exercise of a government's sovereign powers:

1. The position must be created by the constitution, by the legislature, or through authority conferred by the legislature.

2. It must possess *a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public*.

3. The powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the legislature or through legislative authority.

30

4. The duties must be performed independently and without control of a superior power, other than the law (with exceptions not applicable here).

5. It must have some permanency and continuity and not be only temporary or occasional.

*See Forty-Second Legislative Assembly v. Lennon*, 156 Mont. 416, 422-23, 481 P.2d 330, 333-34 (1971) (citing *Barney*, 79 Mont. at 528-29, 257 P. at 418). The *Barney* Court synthesized this five-prong test from various non-Montana authorities. *See Barney*, 79 Mont. at 515-29, 257 P. at 413-18.

¶53 Here, the position of Crow Tribal Chairman clearly meets the definition of "public office." The position is created by the Crow Constitution under Article IV of that document ("Executive Branch of Government"). The position possesses a delegation of a portion of the sovereign power of the Crow tribal government to be exercised for the benefit of the public. The powers and duties of the position are defined in Article IV— thus eliminating the need for definition by the tribal legislature. *See Barney*, 79 Mont. at 523, 257 P. at 416 (stating the inquiry simply as, "Are his duties prescribed by law?"— not necessarily "by the legislature"). The duties are performed independently and without control of a superior power other than the law. And the constitutionally created position has permanency and continuity. There can be no doubt that Crow Tribal Chairman is a "public office."

¶54 The Court asserts that the first and third elements of the five-prong test are not met here because the position of Crow Tribal Chairman "is not created by the Montana Constitution nor by the Legislature" and the powers and duties of the position "are not

31

directly or impliedly defined by the Montana Legislature." Opinion, ¶ 22. But these observations miss the mark. The fact that the position is not created by the Montana Constitution or the Montana Legislature and the fact that its powers and duties are not defined by the Montana Legislature establish nothing except that the position is not a "public office" *of this state.* That is not the relevant question, however. The question, rather, is whether the position is a "public office"—period—since that is what the constitutional language says. And, for the reasons just discussed, it plainly is a "public office"—albeit, one created by a different sovereign, but no less a "public office."

¶55 Next, is the position "elective"? An "elective office" is "[a]n office that is filled by popular election rather than by appointment." *Black's Law Dictionary* 596 (9th ed.); *accord Black's Law Dictionary* 610 (rev. 4th ed.) ("One which is to be filled by popular election. One filled by the direct exercise of the voters' franchise."). Here, Article IV, Section 1 of the Crow Constitution states that the position of Tribal Chairman "shall be elected by the qualified voters." Thus, there can be no doubt that the position of Crow Tribal Chairman is an "elective public office." Article VII, Section 10 of the Montana Constitution states that a holder of a judicial position forfeits that position by "filing for an elective public office other than a judicial position." Not Afraid filed for an "elective public office" that was an executive position. Hence, he forfeited his judicial position.

¶56 The Court circumvents this plain-meaning interpretation of the unambiguous constitutional language by manufacturing an ambiguity where there is none. The Court asserts that Article VII, Section 10 is ambiguous—thus justifying resort to extrinsic

32

sources—because it does not expressly state whether it applies to an "elective public office" *of another sovereign*. Opinion, ¶ 16. I disagree with this "failure by omission" approach. We can always criticize a statute or constitutional provision for using a general term in lieu of listing every specific object to which the provision is intended to apply. But that does not make the general provision ambiguous; it simply makes the provision broad and nonexclusive. This issue came up during the 1972 Constitutional Convention with respect to the jurisdiction of the district courts. The 1889 Constitution articulated a laundry list of cases and writs over which the district courts had jurisdiction. However, the delegates eschewed that approach in favor of general language so as not to imply that any cases or writs not specifically identified in the constitutional provision were excluded from the district courts' authority. *Compare* Mont. Const. art. VIII, § 11 (1889), *with* Mont. Const. art. VII, § 4(1) (1972).[5]

---

[5] *See also e.g.* Montana Constitutional Convention, Verbatim Transcript, Feb. 26, 1972, pp. 1049-50 (Delegate Berg): "We have deleted from the existing Constitution the reference to all of the various types of cases that are enumerated there, because it doesn't add anything and, if anything, it may be limiting. It may be confusing. What the existing Constitution says and what the majority report says is, it has jurisdiction in all cases in law and equity, including—and then it goes down and it specifies all of the various types of cases that may be included. But we're looking to the future now. We don't know and we can't say, no lawyer here can assure you that the various types of cases enumerated within the old Constitution and still contained in the majority report will be adequate for full adjudication of all rights, and what a shame and a colossal mistake it would be for a person to have a wrong and no remedy because the remedies have been so categorized and specified and this particular wrong is not included. This would be a colossal error. To avoid that possibility, we have done just like almost all other states, just like the United States Constitution, we've said it has original jurisdiction in all cases, both civil and criminal. Then we add, so that there's no question, about the authority of the District Court to issue original and remedial writs. That covers the waterfront. It covers every conceivable known writ today. If, in the future, it becomes necessary to recognize—

33

¶57 Likewise here, the language is general: Any holder of a judicial position forfeits that position by filing for "an elective public office other than a judicial position." The delegates chose this broad, nonexclusive, and unqualified language. It thus was not necessary for them to state that the term "elective public office" includes elective public offices "of another sovereign." If anything, they should have qualified the language which they actually used if they intended for it to be limited to "elective public offices *of this state*." Indeed, had they wanted to limit the scope of "elective public office" to *state* offices, they certainly could have included the "of the state" language which the Court wrongly inserts into Article VII, Section 10. *See* Opinion, ¶ 25 (asserting that "tribal offices are creations of another sovereign and not considered public offices *of the state*"—even though "of the state" is not part of Article VII, Section 10's language (emphasis added)).

¶58 In short, although constitutional language "should be given its natural or ordinary meaning," Opinion, ¶ 16, the Court fails to abide by this directive and instead inserts words ("of the state") that do not appear in Article VII, Section 10. This approach violates Montana's blackletter law—§ 1-2-101, MCA[6]—which is so often invoked by

_____

perhaps through the Legislature—a new writ that will accomplish purposes unknown today, the jurisdiction is there to do it.

[6] "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. This same rule applies in the construction of constitutional provisions. *See State ex rel. Nelson v. Ninth Jud. Dist. Ct.*, 262 Mont. 70, 79, 863 P.2d 1027, 1032 (1993); *accord* Opinion, ¶ 15.

every member of this Court that it would be silly to provide pages of string-cites for the principle. The Court errs in reading into the Constitution language that is not there.

¶59 Lastly, I do not believe the extrinsic sources cited by the Court support its ultimate construction of Article VII, Section 10. First, with regard to the January 29, 2003 hearing on HB 190, the Court in effect attributes constitutional significance to the remarks made in response to a question about the scope of a proposed statute. Opinion, ¶ 19. This approach sets bad precedent, not only because the remarks had absolutely nothing to do with the meaning of Article VII, Section 10, but most fundamentally because it is the province and duty of *the judiciary*, not speakers at legislative hearings, to interpret the Constitution and say what the law is. *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *Mont. Petroleum Tank Release Comp. Bd. v. Crumleys, Inc.*, 2008 MT 2, ¶ 57, 341 Mont. 33, 174 P.3d 948.

¶60 Likewise, I do not find the Title 13 election statutes cited by the Court to be of any persuasive value. The Court considers it "notabl[e]" that tribal offices are missing from the definition of "public office" in § 13-1-101(28), MCA, which states: " 'Public office' means a state, county, municipal, school, or other district office that is filled by the people at an election." Opinion, ¶ 19. I find this, however, to be quite unsurprising. The Legislature does not dictate the procedures for electing candidates to tribal offices—a point the Court makes in ¶ 12—and thus there would be no reason for the Legislature to include tribal offices in the definition of "public offices" in Title 13. Title 13, after all, sets forth the procedures for electing candidates to *state* offices, not tribal offices.

35

Moreover, Title 13 does not purport to implement Article VII, Section 10, and thus its definition of "public office" affords no insight whatsoever.[7]

¶61     On the other hand, the Attorney General has opined—in a 1991 decision which focused on a different issue—that §§ 3-1-607 and -608, MCA, are implementing statutes for Article VII, Section 10.  Opinion, ¶ 18.  Yet, I am aware of no occasion on which the Attorney General has opined that these statutes *fully* implement the constitutional provision; and the language of the statutes themselves indicates that they do not purport to do so, but rather are directed at three specific state judicial offices.

¶62     To summarize, then, the Court takes unambiguous constitutional language, manufactures an ambiguity, and then uses extrinsic sources of limited or no probative value to rewrite the constitutional language—in violation of the canons of construction—from "an elective public office other than a judicial position" to "an elective public office *of the state* other than a judicial position."  I strongly dissent from this approach and from the Court's corresponding conclusion that Crow Tribal Chairman is not an "elective public office" under Article VII, Section 10.

### III.  "Forfeits"

---

[7] Given the Court's heavy reliance on the election statutes, one cannot help but question the incongruity of grounding today's decision on statutes that *do not* implement Article VII, Section 10, while completely ignoring statutes that *do* implement Article VII, Section 11(2).  As discussed, § 3-1-1106(1), MCA, requires that JSC proceedings be founded upon a verified written complaint by a citizen, not upon the JSC's own motion.

¶63 Having concluded under the foregoing analysis that Not Afraid filed for "an elective public office other than a judicial position," the question arises as to what consequences flow from this action.

¶64 As noted, Article VII, Section 10 states that the holder of a judicial position "forfeits that position" either by filing for an elective public office other than a judicial position or by absenting himself from the state for more than 60 consecutive days. This language is both mandatory and prohibitory. It dictates that forfeiture occurs upon either of the two stated events. Correspondingly, it deprives the officeholder of his or her power to act in a judicial capacity. As Delegate Dahood observed during the Constitutional Convention:

> [C]onstitutions are based on the premise that they are presumed to be self-executing, particularly within the Bill of Rights. If the language appears to be prohibitory and mandatory, . . . then in that event, the courts in interpreting the particular section are bound by that particular presumption and they must assume, in that situation, that it is self-executing.

Montana Constitutional Convention, Verbatim Transcript, Mar. 7, 1972, p. 1644. Thus, once it is clear that either of the two events described in Article VII, Section 10 has occurred, then forfeiture of the judicial position is automatic.

¶65 We interpreted this language in one case, *Comm. for an Effective Judiciary v. State*, 209 Mont. 105, 679 P.2d 1223 (1984), where we held unconstitutional two statutes which, in direct contradiction to the language of Article VII, Section 10, required a district court judge or a Supreme Court justice to resign from his or her office in order to

37

run for any elective office under the laws of Montana, including another judicial position.

Importantly, for purposes of the present discussion, we stated:

> The judicial article is clearly the most restrictive—it imposes severe sanctions on office-seeking by judicial office holders. Any judge holding office in this state forfeits his office if he files for any office—"*other than a judicial position*." (Art. VII, § 10, supra.) *Though it does not mention filing for a legislative or an executive office, the crystal clear message of this provision requires a judge to forfeit his judicial office if he files for either a legislative or an executive office.*

*Comm. for an Effective Judiciary*, 209 Mont. at 115, 679 P.2d at 1228 (first emphasis in original, second emphasis added).

¶66 Our determination that a judge forfeits his judicial office if he files for an executive office is in accord with the intent of the delegates, as evidenced by the following exchange which occurred when Article VII, Section 10 was recommended for adoption as it is now written:

> **CHAIRMAN GRAYBILL:** I take it that this means that he's—he forfeits if he does either of these two things which were contained in two separate paragraphs above; namely, files for another elective office or absents himself for 60 days. Is that right?

> **DELEGATE SCHILTZ:** That's right.

Montana Constitutional Convention, Verbatim Transcript, Mar. 13, 1972, p. 2187.

¶67 Thus, it is clear from the plain language of Article VII, Section 10, as confirmed by the delegates' comments, and from our interpretation of this language in *Comm. for an Effective Judiciary* that when a judge files for a nonjudicial elective public office, the judge forfeits his judicial position. That is precisely what the Constitution says.

38

¶68    To "forfeit" means "to lose or lose the right to by some error, offense, or crime." *Merriam-Webster's Collegiate Dictionary* 457 (10th ed., Merriam-Webster 1997). "Forfeiture" has a well-understood meaning in the law. It involves "[t]he loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty." *Black's Law Dictionary* 722 (9th ed.). In other words, forfeiture means that a person loses a right or privilege as a consequence of having done or omitted to do an act. It is a divestment as a consequence of default or offense; a loss by reason of misdeed or transgression. In the usual context, forfeiture occurs simultaneously with the act, error, omission, or violation of the condition precedent. Examples of these principles appear repeatedly in our cases. *See e.g. State v. Riggs*, 2005 MT 124, ¶ 45, 327 Mont. 196, 113 P.3d 281 (juror might have to forfeit airline tickets that he held for a flight which was scheduled to depart the following morning); *State v. Sanchez*, 2008 MT 27, ¶ 47, 341 Mont. 240, 177 P.3d 444 (criminal defendant forfeits his constitutional right to confront the victim at trial when he admittedly and deliberately kills the victim); *State v. Cotterell*, 2008 MT 409, ¶ 88, 347 Mont. 231, 198 P.3d 254 (a person convicted of unlawfully taking, killing, possessing, or transporting a deer, antelope, elk, or mountain lion "shall forfeit" his or her license for 24 months); *Mungas v. Great Falls Clinic*, 2009 MT 426, ¶¶ 8-9, 354 Mont. 50, 221 P.3d 1230 (contract provided that doctors forfeit accounts receivable and interest in surgery center if they violate covenant not to compete).

¶69    The JSC, however, construes the *forfeiture* provision as a *resignation* provision that works prospectively, where a judge has violated Article VII, Section 10 but refuses

to give up his judicial position during his campaign for the nonjudicial office. The JSC acknowledges that Not Afraid did not resign his judicial position when he filed for Crow Tribal Chairman; and, for that, the JSC recommends that we publicly reprimand him. Then, given that Not Afraid ultimately did not win the Tribal Chairman position in the April 2009 general election, the JSC states:

> Should [Not Afraid] file for non-judicial elective public office in the future (tribal or non-tribal), and *refuse to forfeit* any judicial position held at that time, the Judicial Standards Commission will immediately file a formal complaint with the Montana Supreme Court and request immediate suspension from office while the complaint is pending. [Emphasis added.]

¶70 Setting aside the fact that the JSC has no authority to file complaints for the reasons already discussed, the JSC's approach contemplates that if either of the two events described in Article VII, Section 10 occurs, then the judge must affirmatively resign his or her position in order for the forfeiture to take effect and the office to become vacant. The JSC's theory appears to be that forfeiture is not automatic but, rather, requires a resignation or some sort of proceeding to declare the judge's office vacant.

¶71 This approach is wrong and in contradiction to the unambiguous language of the Constitution. Article VII, Section 10 does not give the officeholder the choice or option of whether to resign—and when. The Constitution does not state that the holder of a judicial position "must resign" that position if he either files for a nonjudicial elective public office or absents himself from the state for more than 60 consecutive days. The JSC's approach reads into the Constitution language that is not there, and ignores the plain language that is there, in violation of this Court's precedent. *See Montanans for*

40

*Equal Application of Initiative Laws v. State*, 2007 MT 75, ¶ 46, 336 Mont. 450, 154 P.3d 1202 (setting out the rules of constitutional construction); *see also* ¶ 58 n. 6, *supra*.

¶72   The JSC's approach would allow a justice of the peace to file and run for the office of Governor while continuing to sit on the bench—so long as the justice refuses to resign, and until he is formally removed from office.   Just as untenable, the JSC's approach would require a resignation or some sort of proceeding to declare a judicial position vacant if the judge leaves the state for six months to take up residence in Argentina with his mistress.   That the JSC's approach would countenance such a result in either case is nonsensical.   With respect to the latter situation, moreover, the JSC's approach is contrary to statute.   *See* § 2-16-501(6), MCA ("An office becomes vacant *on the happening* of any one of the following events before the expiration of the term of the incumbent: . . .   except as provided in 10-1-1008, absence of the incumbent from the state, without the permission of the legislature, beyond the period allowed by law." (emphasis added, paragraph breaks omitted)).   It should be noted, as well, that by the time the machinery to remove the intransigent judge comes to bear, he will have continued to render decisions—some, perhaps, in cases affecting his campaign contributors and the voters of the county or district over which he presides.[8]   He will have shaken hands with, and made campaign promises to, some of the very people who

---

[8] Of course, those decisions will all be void *ab initio*.   *See* ¶ 81 n. 10, *infra*.

appeared in his court seeking justice or requiring punishment.[9] That is not what the Constitution allows; it is not what the delegates intended; and it is not how this Court interpreted Article VII, Section 10 in *Comm. for an Effective Judiciary*.

¶73 The fact is that the judge's formal resignation, or refusal to do so, is completely immaterial. His forfeiture of office occurs by reason of, and coincidentally with, the prohibited act of filing for a nonjudicial elective public office or absenting himself from the state for more than 60 consecutive days. Accordingly, when Not Afraid filed for a nonjudicial elective public office, he immediately forfeited his position as justice of the peace. His office became vacant at the time of filing, without more.

¶74 I recognize that there may be instances in which the officeholder claims that he or she did not file for a nonjudicial elective public office or was not absent from the state for more than 60 consecutive days. In that situation, a fact-finding proceeding may be necessary. But that is not situation here, as it is undisputed that Not Afraid filed for Crow Tribal Chairman—which, under my analysis above, is a nonjudicial elective public office. In this regard, I note that Not Afraid, in response to letters from the JSC directing him to resign, not only refused to do so but also, in blatant defiance of the Constitution, asserted that if he again ran for a tribal office, he would not resign his position as justice of the peace. This is a good example of why forfeiture under Article VII, Section 10 is automatic. A defiant judicial officer must not be allowed, as here, to thumb his nose at

---

[9] In the present case, Not Afraid conceded that all voters for the Crow Tribal Chairmanship were potential future litigants or defendants before him as Big Horn County Justice of the Peace.

42

the Constitution by refusing to "resign" his already forfeited office with the challenge, "Remove me if you think you can!"

¶75 Indeed, reflecting this sort of contumaciousness, Not Afraid argues that his tribal political activities are beyond the reach of Montana law. Such argument, however, is unavailing and without merit. While neither the JSC nor this Court has jurisdiction over the Crow tribal government and its elected officers, that is not the point. Both the JSC and this Court unquestionably *do* have jurisdiction over Not Afraid as an elected justice of the peace in Big Horn County and, accordingly, must require him to follow Montana's Constitution and laws in the conduct of his state judicial office. In this regard, Article VII, Section 10 prohibits the holder of a state judicial position from filing for a nonjudicial elective public office (lest he forfeit his current position) without any distinction as to the sovereign to be served. It prohibits him from filing for a Montana nonjudicial elective public office, a federal nonjudicial elective public office, a tribal nonjudicial elective public office, or a nonjudicial elective public office in another state or country. To the extent Not Afraid believes that serving simultaneously in his state judicial office and a tribal executive office are compatible, that argument has already been rejected by the Constitutional Convention delegates. As the Attorney General has pointed out, compatibility is not a factor under Article VII, Section 10. *See* Mont. Atty. Gen. Op. 44-21, 1991 Mont. AG LEXIS 21 at **7-8 (Oct. 22, 1991).

¶76 In sum, the forfeiture provision of Article VII, Section 10 is self-executing. The act causing the forfeiture—filing for a nonjudicial elective public office or absenting

43

himself or herself from the state for more than 60 consecutive days—immediately and automatically creates a vacancy in the office, which must then be filled according to law. *See e.g.* Mont. Const. art. VII, § 8(2) (Supreme Court justices and district court judges); § 3-10-206, MCA (justices of the peace). The language of Article VII, Section 10 requires neither a resignation nor a proceeding to declare the office vacant. The prohibited filing or absence creates the forfeiture, and the forfeiture creates the vacancy.

## IV. Conclusion

¶77 The Court's Opinion today is incredibly far-reaching—and, in my view, patently wrong on any number of levels.

¶78 First, the Court does not adequately address the jurisdiction of the JSC over this case. The JSC's procedure of hiring its own prosecutor to file a complaint in its own name is contrary to the unmistakable intent of Article VII, Section 11(2) and the dictates of § 3-1-1106, MCA, which require that judges and justices be charged and disciplined based upon a complaint filed by a citizen, *not the JSC itself.* The Court errs in not following these constitutional and statutory mandates. Instead of acknowledging and condemning the JSC's unlawful process in this case, today's Opinion blesses the abuse. I cannot agree. After today's decision, it appears that if the JSC feels the language I have used in this dissent is too "intemperate," *Shea*, 198 Mont. at 20, 643 P.2d at 213, then the JSC may file a complaint against me sua sponte, and I will be forced to defend in a proceeding where my accuser is also my judge.

44

¶79    Second, while the Court, in one breath, waxes eloquent about the sovereignty of the Crow Tribe as a separate government, the Court then, in the next, demeans that same sovereignty by equating the Crow Tribe to "a group whose membership is narrower than the general public"—not unlike a social club or a sporting group—and by refusing to recognize the offices of the Crow tribal government as "elective public offices." No doubt the Crow Tribe will be surprised, if not insulted, to learn that its government and its elective public offices are not on the same par as Montana's. Again, I cannot agree.

¶80    Third, it is now apparently lawful for a sitting Montana justice of the peace, at least, to hold both his or her tribal executive office and his or her Montana judicial office at the same time. This holding perverts another fundamental principle of judicial ethics and conduct enshrined in Article III, Section 1 (Separation of Powers) and Article VII, Section 10—namely, that one cannot serve two masters. A Montana judge or justice cannot serve the master of the judicial branch and the master of the legislative or executive branch at the same time. A judge or justice owes his or her exclusive loyalty and obligation of duty to one branch of government—the judicial branch—to the exclusion of any loyalty or obligation of duty to either of the other two branches. That is what the doctrine of separation of powers and the prohibition of Article VII, Section 10, read together, require. That fundamental, core principle is written into the 2008 Montana Code of Judicial Conduct, in the Preamble and Rules 1.2, 2.1, 2.2, 3.1, and 3.2— demanding the independence, impartiality, and integrity of the judiciary, and eschewing any appearances of impropriety and conflicts of interest. A sitting Montana judge cannot

45

possibly serve simultaneously as a publicly elected official in another branch of government, much less in another sovereign government, and comply with the Constitution and the Code of Judicial Conduct. A sitting Montana judge cannot owe his or her professional allegiance to two different sovereigns. He or she cannot serve two masters—until today. Again, I cannot agree.

¶81   In sum, I would hold that the JSC had no jurisdiction over this action, and I would dismiss the case on this basis. But as to the merits of the JSC's complaint, which the Court proceeds to address, I would hold that Not Afraid forfeited his judicial position on March 6, 2009, when he filed for the office of Crow Tribal Chairman and that his judicial office has been vacant since that date. I would further hold that any judicial act which Not Afraid performed during his unlawful tenure is, therefore, void *ab initio*.[10] Finally, I would order that his successor be appointed in accordance with applicable law. Again, I cannot agree with our contrary approach.

---

[10] *See Potter v. Sixteenth Jud. Dist. Ct.*, 266 Mont. 384, 880 P.2d 1319 (1994); *State v. Vickers*, 1998 MT 201, 290 Mont. 356, 964 P.2d 756; *Pinnow v. Mont. State Fund*, 2007 MT 332, 340 Mont. 217, 172 P.3d 1273. *Potter* and *Vickers* involved individuals who failed to comply with the procedures required by statute for serving as a substitute justice of the peace. In both cases, we held that the failure to comply with these procedures meant that the individual was not a judge and was not vested with the powers and authority of a judge—the result being that their judicial acts (in particular, the issuance of the search warrants at issue) were void *ab initio*. *See Potter*, 266 Mont. at 393, 880 P.2d at 1325; *Vickers*, ¶¶ 26-29. Similarly, in *Pinnow*, we held that a district court judge was without authority to assume jurisdiction over a workers' compensation case following the recusal of the Workers' Compensation Court judge, and that the case, therefore, had for all intents and purposes been idle since the judge's recusal and all orders issued by the district court judge were void and of no legal effect. *See Pinnow*, ¶¶ 15-25, 36. Likewise, here, any decisions issued following forfeiture under Article VII, Section 10 are void and of no legal effect.

¶82    Today's decision establishes bad policy, bad precedent, and a bad result.  I cannot agree.  I have no doubt that Montana's judges will be shocked by the Court's decision.

¶83    I concur in the result but dissent from the reasoning.


/S/ JAMES C. NELSON